CASE 33—PETITION EQUITY—JUNE 4.

# Ferguson, &c., vs. Landram, &c.

.APPEAL FROM GALLATIN CIRCUIT COURT.

1.  To avoid the draft in 1864, a large portion of the people of Gallatin county met at the county seat and resolved to raise twenty thousand dollars as a military fund, to be distributed among those who should thereafter volunteer, in addition to the bounty offered by the Federal Government, and appointed a committee to borrow the money, and to obtain an act of the Legislature to authorize the county court of said county to issue bonds and to levy a tax to reimburse the money so expended. The money was borrowed; the volunteers obtained; the draft prevented; the necessary act of the Legislature procured; the bonds issued, and the tax was levied by the county court.

    In *Ferguson, &c., vs. Landram, &c.*, 1 *Bush*, 548, this court held the said act of the Legislature, authorizing the issual of the bonds and levy of the tax, to be unconstitutional and invalid as to those who did not participate in procuring its passage, and have never ratified it, and have received no benefits therefrom; but that all who participated in procuring its passage, have acquiesced in or approved it, or have been recipients of benefits under it, should not escape responsibility.

    NOTE.—Judge ROBERTSON held the act above referred to *constitutional;* but the majority of the court held it to be *unconstitutional.*

2.  On injunction against collecting the tax, the former decision of this court is adhered to, and the persons therein held responsible are

now held liable to the tax, and as being estopped from denying the constitutionality of said enactment.

In procuring the money, and obtaining with it the volunteers, such parties violated no law of morality or of the Government; their contract was not void for want of consideration or for illegality; but *it is the means* by which the sum for its reimbursement is to be raised that they assail.

3. Parties are estopped from denying the constitutionality of a local statute by participating in the procurement of its passage; by ratifying, acquiescing in, or approving it after its passage, and by becoming recipients of benefits under it; and all such persons are held to be liable to the tax authorized by such enactment, although it is unconstitutional and invalid as to all other persons. (4 *Kent, Comstock's ed., note* 4, *s. p.* 261; 3 *Hill,* 219; *Moran et al. vs. Commissioners of Miami County,* 2 *Black,* 722.)

JOHN W. STEVENSON,        For Appellants,

CITED—

1 *Bush,* 548, 565, 586–7 ; *Ferguson, &c., vs. Landram, &c.*

18 *Howard,* 347–8; *Dodge vs. Woolsey.*

16 *Eng. Law and Equity R.,* 180; *McGregor vs. Official Managers of D. and D. R. R.*

17 *Eng. Law and Equity R.,* 505 ; *East. Ang. R. R. vs. Eastern Counties.*

12 *Beavan's Rep.,* 339; *Solomon vs. Laing.*

21 *U. S. Rep.,* 441; *Pearce vs. Madison and Quincy R. R.*

3 *McLean's R.,* 102; *Root vs. Goddard.*

4 *McLean's R.,* 8; *Root vs. Wallace.*

8 *Gill & Johnson,* 248; *Dandridge's Case.*

22 *Conn.,* 502; *Hood vs. N. Y. and N. Haven R. R. Co.*

23 *Conn.,* 457; *Elmore vs. Naugatuck.*

24 *Conn.,* 159; *Mutual Savings vs. M. Agency Co.*

1 *Douglass* (*Mich. Rep.*), 401; *Bank of Michigan vs. Niles.*

16 *B. Mon.*, 422; *Sandford vs. McArthur.*

1 *Hill's N. Y. Rep.*, 12; *Safford vs. Wykoff.*

5 *Denio*, 567; *McCullough vs. Moss.*

2 *Parsons on Contracts*, 793, *and cases cited.*

13 *Barbour*, 137; *Cohoe's Con. vs. Goss.*

5 *Eng. L. and E.*, 533; *Callon vs. Jenkinson.*

19 *Maryland R.*, 72; *Cecil vs. Cecil.*

12 *Barbour*, 128; *Peckard vs. Sears.*

6 *Adolph & Ellis*, 469; 10 *Iredell's Rep.*, 110.

4 *Hawk's N. C. R.*, 132; *Taylor vs. Sherford.*

4 *Dev. & Bat. N. C. R.*, 407; *Cowle vs. Lumsford.*

1 *C. & B.*, 888; *Steadman vs. Duhamel.*

6 *Selden* (10 *N. Y.*), 402; *Jewell vs. Weller.*

11 *Illinois*, 531; *Mussan vs. Noble.*

JOHN J. LANDRAM and
JOHN L. SCOTT,                                    For Appellees,
                          CITED—

1 *Bush*, 565, 599, 600; 1 *Greenleaf's Ev.*, sec. 78.

4 *Mass.*, 593; *Buckminster vs. Perry.*

7 *Pick*, 94; *Brooks vs. Barrett.*

8 *Conn.*, 254; 8 *Greenleaf*, 42.

6 *Mass.*, 397; *Hubbard vs. Hubbard.*

12 *Pick.*, 177; *Lane vs. Crombie.*

4 *Eng. Law Eq. Rep.*, 531.

1 *Greenleaf*, 134; *Ulmer vs. Leland.*

4 *Greenleaf*, 226; *Gibson vs. Waterhouse.*

2 *Greenleaf*, 128; *Settle vs. Thompson.*

6 *Greenleaf*, 274; *Smith vs. Moore.*

2 *Pick.*, 103; 3 *B. & B.*, 307; 7 *Moore S. C.*, 158.

1 *East*, 637; *Rex vs. Stone.*

5 *M. & S.*, 206; *Rex. vs. Turner.*

14 *Illinois*, 279; *Woodbury vs. Frink.*

*Session Acts* 1865, sec. 6, p. 66.

---

Ferguson, &c., vs. Landram, &c.

---

13 *B. Mon.*, 26; *Slack vs. Maysville and Lexington R. R. Co.*

10 *Amendment to U. S. Constitution.*

9 *B. Mon.*, 343; *Cheaney vs. Hooser.*

9 *Dana*, 23; *City of Lexington vs. McQuillan's heirs.*

4 *Wheaton*, 428; *McCulloch vs. State of Maryland.*

4 *Peters*, 514; *Providence Bank vs. Billings.*

4 *Comstock* 424; *The People vs. Brooklyn.*

19 *N. Y.*, 116; *Brewster vs. The City of Syracuse.*

3 *Kernan*, 143; *Town of Guilford vs. Chenango Co.*

34 *Barbour*, 69; *The People vs. Hawes.*

36 *Barbour*, 192; *The People vs. Lawrence.*

42 *Barbour*, 288; *Litchfield vs. McCombs.*

5 *Howard*, 410; *Fox vs. The State of Ohio.*

14 *Howard*, 13; *Moore vs. State of Illinois.*

5 *Wheaton*, 1; *Huston vs. Moore.*

2 *Metcalfe*, 353; *Cypress Pond vs. Harper.*

9 *Wheaton*, 203; *Gibbons vs. Ogden.*

6 *Cranch*, 87; *Fletcher vs. Peck.*

11 *B. Mon.*, 150; *Clark County vs. Paris Road.*

2 *Black*, 732; *Moran vs. Com'rs of Miami County.*

*Law Register, Sept.*, 1865; *Speer vs. Blairsville.*

*Law Register, Feb.*, 1866; *Booth vs. Town of Woodbury.*

*Law Register, Jan.*, 1867; *Taylor vs. Thompson.*

CHIEF JUSTICE WILLIAMS DELIVERED THE OPINION OF THE COURT:

This case has heretofore been before this court, and may be found reported in 1 Bush, 554, where a more detailed history will be found. It is sufficient now to state, that, in view of the impending draft ordered by the President of the United States in August, 1864, under authority of the several congressional acts, for Federal soldiers to serve three years, or until the close of the then exist-

ing war, that portion of the male people of Gallatin county within military age were required to furnish one hundred and forty-seven soldiers as their quota. To avoid the draft, and to facilitate the raising of volunteer soldiers, a large portion of the people of the county met at their county seat August 29, 1864, and resolved to raise twenty thousand dollars as a military fund, to be distributed among those who should thereafter volunteer in addition to the bounty offered by the Federal Government, and appointed a committee to borrow the money and to obtain an act of the State Legislature authorizing a taxation to raise the means to reimburse the loan.

The money was borrowed ; the volunteers obtained; the draft prevented, and the necessary enactments passed by the Legislature; and all seemed satisfactory until the close of the war in the spring of 1865; after which, a large number of the citizens of the county filed a petition praying an injunction from the levy and collection of the taxes on and from them.

When this case was previously here, this court decided that the Federal Government, having gone directly to the people as a Government, and not calling on the different States, as it might have done, to furnish their proper *quota*, that the State had no constitutional power to levy an involuntary tax on the citizens of the various counties to give to the Federal soldier an additional compensation, nor had it the power to levy an involuntary tax on those not subject to military duty, to aid those who were to escape their responsibility by way of inducing volunteers for such additional compensation.

But this court then held, that, so far as citizens had voluntarily authorized the raising of said sum, or had memorialized the Legislature to enact the law, and had received its benefits, and by their own actings and

doings had procured the enactments, had tacitly, or otherwise voluntarily, consented to it by receiving its benefits, or owed said military service, they should not be heard to assail its validity, or the taxes levied under it to raise the funds thus obtained at their own instance, or expended for their own use.

On the return of the cause, amended pleadings were filed, averring that the plaintiffs belonged to the classes which this court had said should not be permitted to assail said enactments; and the court having on final trial so adjudged as to a portion, they have brought up the case again for review; insisting, first, that they are not estopped from assailing the said statutes, even if they sought their enactments or were benefited thereby, because, as to unconstitutional enactments, there can be no estoppel; secondly, that they have done nothing as matters of fact to estop them, even under the ruling of the court.

Their counsel insisting that the only question before the court formerly being the invalidity of those statutes, no question of estoppel was involved, and, therefore, not *res adjudicata*, but *obiter dictum*. If, however, the former, he respectfully asks a reconsideration of the question, as it was not presented and argued by the counsel on that trial. We have, therefore, duly considered it again on the able arguments and imposing lists of authorities presented.

It is insisted that not a case can be found wherein a party was estopped from urging the constitutional invalidity of an enactment. Were this so, still it would not necessarily establish the affirmative of the proposition, but would only leave the question to be determined upon its own intrinsic merits from the peculiar facts developed.

Whilst it may be justly conceded that there are many phases in which unconstitutional statutes might be assailed, perfectly consistent with strictly legal principles and the most rigid equity, yet this may not be universally true.

In *Lee vs. Tillotson*, 24 *Wend.*, 337, it was held in New York that "a party may waive a constitutional as well as a statute provision made for his own benefit. The contrary argument would deprive a criminal of the power to plead guilty, on the ground that the Constitution had secured him a trial by jury.

In *note b*, 4 *Kent's Com.*, 282, *Comstock's edition, on s. p.* 261, it is said, as to estoppels on matters *in pais:* "The sense of estoppels is, that a man, for the sake of good faith and fair dealing, ought to be estopped from saying that to be false which, by his means, has once become accredited for truth, and, by his representations, has led others to act. The very definition of estoppel, said Mr. Justice Cowen, in 3 *Hill*, 219, is when an admission is intended to lead, and does lead, a man, with whom the party is dealing, into a line of conduct which must be prejudicial to his interest, unless the party estopped be cut off from the power of retraction."

In the case under advisement, a very large class of the citizens of the county owed military duty to the Federal Government, which must be discharged by furnishing one hundred and forty-seven able-bodied soldiers for three years or during the war. If they were not furnished—as they had not been—by a given day, these soldiers were to be selected by draft from those who owed the service, and the draft was to be repeated until the requisite number of able-bodied soldiers were obtained.

Many who were not liable themselves had near and dear relatives who were; others owned slaves so liable.

This service was known to be arduous and hazardous; and, to many Kentuckians, peculiarly afflicting, because they had relatives on both sides. Many of those to whom Nature's God had bound them by the tenderest ties of consanguinity were in the military service of the " Confederate States;" and, therefore, in the discharge of this duty, they might necessarily run the risk of killing or being killed by those around whom twined the tenderest affections of the heart. That they should abhor and shrink from such a service was not unnatural.

With these peculiar interests, surroundings, and affections, without regard to political sentiment or the peculiar sympathies for the respective causes, it was but natural that a common feeling, founded in the deepest, delicate law of our own nature and of our own existence, appealing to the most affecting sympathies of the heart, should drive those so circumstanced into a common consultation, with a common desire to escape a common impending calamity; and having, by a unity of interest, of sympathies and desires, become united in action, in the procuring of this fund and these statutes, when the impending calamity had passed, and when no longer a common interest appealed to the same fears and affections, if a portion is permitted to escape responsibility, it would result in a stupendous fraud, either upon those who, at their instance and for their benefit, borrowed the money, or upon those who loaned the money; or upon that class who, like themselves, desired to be exonerated from the draft, and who are made to pay it.

Upon what principle of exalted equity shall a man be permitted to receive a valuable consideration through a statute, procured by his own consent, or subsequently sanctioned by him, or from which he derives an interest and consideration, and then keep the consideration and repudiate the statute as unconstitutional?

Suppose five hundred citizens of Gallatin county had come together, and, by written agreement, authorized certain gentlemen, as their agents, to borrow $20,000, to be used for raising volunteers to prevent themselves and relatives from being conscripted, is there any doubt that those loaning the money could recover it by personal action from them? And whether evidenced by writing, or proven in parol, the creditors' rights would be the same.

If they could then bind themselves, personally and collectively, without a statute, but to render the collection more secure, less uncertain as to the recipients, and more equitable, they should agree, instead of giving their personal obligations, to procure an enactment to compel each one to contribute according to the amount of his property, and constitute the county court their agent to determine this, and have the proper assessment made and collected from each, by what rule of equity or law should they be permitted to withdraw their assent to this assumed liability and agency, though it be evidenced by a statute instead of a mere personal contract?

However others not liable to this duty, therefore in no danger of this calamity, and who had nothing to do with the procurement of the fund nor the enactment of the statutes, might well deny the constitutional power of the Legislature to enact upon them an involuntary liability, would this authorize the courts to hear and pronounce the same judgment as to those who were liable to the duty, caused the procurement of the fund and enactment of the statutes, or availed themselves of the benefits of both?

The distinction between the two classes is as broad, and deep, and tangible, as is the light, and law, and equity dispensed by the Eternal Judge and Chancellor of

the Universe, and existing, though dimly shadowed, in all human governments. It is founded upon this great legal and equitable principle that these men must return the consideration they have voluntarily received before they shall be heard to assail the action and statutes by which they have received it.

In procuring this money, and obtaining with it volunteer soldiers, these men violated no law of morality or of government. Their contract was not void for want of consideration or for illegality; but *it is the means* by which the sum for its reimbursement is to be raised that they assail.

Whilst the borrower and lender, of money at usurious rates, both violate law, of course there is neither consideration, nor estoppel, as to the usurious sum; but if the borrower induces a third and innocent party to take the note, he is then estopped, because his conduct becomes fraudulent as to this third party. So a minor who shall contract is not bound, because the other party knows he is doing an illegal act, unless the minor falsely represents he is of age, and thereby induces another to contract with him under such belief; then, because of his fraud, the minor is estopped. So the maker of a gambling note is not estopped so long as it remains in the hands of the original party, who, like himself, violated the law; but when the maker shall induce a third and innocent party to take it, representing that it is binding on him, he is estopped from setting up the illegality of the consideration because of his fraud. So may corporations avoid contracts they have no legal power to make until they become fraudulent as to some innocent party, and then they, too, are estopped, as has been often decided. And as was decided by the Supreme Court of the United States, in 1862 (2 *Black*, 722, *Moran et al. vs.*

*The Commissioners of Miami county, Indiana*), which was
a suit by the holders of coupons for interest on the coun-
ty bonds, payable to the Peru and Indianapolis Railroad
Company, and which were actually given in exchange for
stock in said company, but which recited on their face
that they were *given for a loan of money,* the county re-
sisted their validity for various reasons, among which
were, that the subscriptions were not regular according
to law; but although the court strongly intimates that
they could not escape upon that ground, but even if it
could, yet, as an act authorized the county commissioners
to borrow money, the court said, whatever may have been
the equities between the county and the railroad com-
pany, were they the only parties, yet as to third and in-
nocent parties who had purchased the bonds, the county
was estopped, because of the recital in the bonds that
they were issued for loaned money, and this, too, whether
the law authorizing the county to subscribe for stock in
the railroad company had or not been complied with.

Suppose the legal voters of a town should petition
the Legislature to grant a charter for a manufacturing
company, and authorize them to organize it by electing
officers, and conferring on them the power to borrow a
given sum, to be reimbursed by the levy of an annual
tax on the citizens' property, and that each should
have stock according to what he paid of this tax;
whilst this statute would be clearly invalid and unen-
forceable against such, as neither petitioned nor voted
for the officers, yet as to such as did, very different
considerations and questions would arise; for after
voluntarily asking the Legislature to provide by law an
agent for them, and after appointing that agent, by
what rule of law or ethics could they be permitted
to repudiate their agent, and deny their responsibility
to those who may have loaned the money?

Whilst Judge ROBERTSON held this Gallatin county act constitutional, and enforceable against all the citizens embraced in its provisions, the majority of the Court held it only so, as to those who owed the service, and derived an actual benefit and consideration by the raising of the volunteers, and such as participated it its procurement, or afterwards voluntarily ratified it. And Judge ROBERTSON is still of opinion that said act is valid and binding on all the citizens; but as the majority adheres to their former opinion, he concurs with them as to those whom they still hold liable.

All persons who were themselves liable to draft, or had minor sons, or slaves so liable, derived an actual valuable consideration by the avoidance of the draft, and hence are liable. All who participated in the procurement of the law, or afterwards voluntarily ratified it, cannot be heard now to object, especially such as had relatives liable to be conscripted; because having voluntarily waived this constitutional benefit, they shall not be heard to set it up after the money is procured, the volunteers obtained, and the war ended.

Appellants A. B. Chambers, A. H. Bledsoe, John Bledsoe, Wm. Dudgen, E. C. Peak, Thos. Story, F. S. Robinson, Eli Swango, Sylvester Carver, Sylvanus Carver, William Carver, jr., Amos Story, R. E. Craig, W. T. Whitson, jr., C. Bagly, and James Dudgen, were all within military age, and therefore liable, unless they show some special reason for exoneration. Chambers attempts two : First. That he was in prison when the first meeting was held, August 29, 1864, and therefore did not participate. But this imprisonment ended before the money was borrowed, before the volunteers were obtained, and before the enactment was procured, or the tax levied.

Secondly. He asserts that he had been exonerated from the previous draft, and was not required to pay the commutation thereunder; but he was only exonerated from that draft, not because of permanent disability; and even if so, he should have caused his name to be taken from the subsequent enrollment, as each name increased the quota of the county; beside, he had two slaves subject to draft.

B. F. Beale, Orlow Steele, and John Howlett, were also within military age, and some of them are proven to have been actually enrolled; but as the enrollment books or memorandum have been partially destroyed, all are not so proven, except inferentially.

James S. Ferguson and Wm. Dudgen were proven to be within military age, and actually enrolled.

William Britt had a slave subject to the draft of 1864; hence his responsibility, which is not relieved by his certificate of exemption, dated February 11, 1865, after the liability had been incurred and the draft avoided.

Jacob P. Howard, A. G. Craig, Noel Robinson, Jesse D. Bright, and Addison Gibson, had slaves subject to conscription, and Craig approved the law and advocated the levy of the tax in the county court; hence their liability. Bright, perhaps, was not then a citizen, but temporarily residing in the county.

Robert E. Craig was not only subject to conscription, but very active in trying to save the county from draft.

John T. Robinson advocated the levy of the tax before the county court, and thereby ratified it; and both he and Craig, also, had either sons or sons-in-law who were liable to conscription.

The cause seems not to have been disposed of as to A. G. Hughes; most likely by oversight. As to all the above named persons, the injunction was properly dis-

solved, and as properly perpetuated as to M. C. Hughes, A. D. Whitson, Tyler Whitson, U. C. Allphin, H. P. Baldwin, Virgil McClure, John Bacon, David Story, G. M. Connelly, and Zerilda Morrow. As they were not liable to conscription, no valid reason for enforcing the tax on them is perceived, as the evidence does not show either a benefit, procurement of the law, or a ratification of it by them, which should appear affirmatively before an invalid tax could be enforced against them.

Wherefore, the judgment is affirmed, both as to those against whom the injunction was dissolved and as to those in whose favor it was perpetuated, on the appeal and cross-appeal, with costs against each party in favor of the other on their respective appeals, and damages against Ferguson and others on their supersedeas.