# Richmond.

PURCELL v. CONRAD.

FEBRUARY 21st, 1888.

1. CONSTRUCTION OF STATUTES—*Oyster Planting.*—No irrevocable privilege is acquirable under act March 4th, 1884, § 6, as the right of revocation is expressly therein reserved to the legislature.
2. IDEM—*Constitutionality—Estoppel.*—Whether said act be constitutional or not, a party, who has taken the benefit thereof and claimed under it in his bill, is estopped from contesting its validity.

Appeal from decree of circuit court of Middlesex county, rendered May 5th, 1886, in a certain suit wherein William C. Conrad was plaintiff, and John Purcell and others, were defendants.

The bill sets forth that plaintiff was a citizen of Virginia, and the fee-simple owner of land on Piankatank river, with water front suitable for planting oysters; that he applied under § 6, ch. 254, Acts 1883–84, approved March 4, 1884, to the inspector to assign him on said front sufficient bottom to plant oysters; that inspector, May 4th, 1884, assigned him one-fourth of said front and designated the same, which plaintiff staked off; that he paid inspector his fee and tax or rent for one year; that at time of the assignment defendants had oysters planted on said bottom and were notified of the assignment; that the eighteen months allowed them to remove their oysters had expired, and that he was not only entitled to the bottom but to the oysters upon it; but that they had been taking up and selling oysters contrary to his rights; that the amendment of

said act by the act approved August 27th, 1884 (Acts 1883–84, p. 325), could not defeat his interest in the bottom assigned him under said first act, as he had complied therewith and had acquired a vested right; that he had refused to receive back the fee, rent and tax, and had paid the rent and tax for 1885; that after the amendment the defendants had got the inspector to assign them portions of the bottom assigned him, and claimed the exclusive right thereto, which claim he denied. And he prayed an injunction restraining the defendants from removing oysters from and planting oysters in the bottom that had been assigned him as aforesaid. Such injunction was awarded. In their answer the defendants denied all the material allegations, and declared that long prior to March 4th, 1884, they had been in possession of the bottoms in controversy, and that they had obtained rights thereto under the act of August 27th, 1884. After taking testimony the cause came on upon the defendants' demurrer to the bill and motion to dissolve the injunction; the demurrer was overruled, the injunction perpetuated, and costs decreed against them.

Acts 1883–84, p. 325, § 6, provides: "If any owner or occupier of land, having a water front thereon suitable for planting oysters, shall be desirous of obtaining a location thereon for planting them, he may make application to any inspector for the county in which he resides, who shall assign to him, on such location as such owner or occupant may designate, in front of his land, a quantity sufficient for the said purpose, to be judged of by said inspector, subject to appeal to the judge of the county court of the county in which said land is located, either in term time or vacation, who is hereby authorized to take cognizance of the same, and make such assignment as shall seem proper: provided, that the said assignment shall not exceed one-fourth of said water front, which shall be laid off in a body: and provided, further, that the privilege thus accorded to the riparian owner and other persons hereinafter mentioned, who shall have assignments made to them for planting and propagating

oysters may at any time be revoked, at the pleasure of the general assembly, said revocation to take effect eighteen months from the date of revocation. It shall be the duty of such owner or occupant to cause the same to be marked with suitable stakes, according to the assignment, and thereafter he shall have the exclusive right to the use thereof, and for the purpose aforesaid; and this privilege is accorded to said owner or occupant in consideration of the extra valuation ordinarily assessed upon such land for the water privileges supposed to attach thereto: provided, however, that if said owner or occupant shall sell any oysters from said reservation, he shall pay a tax upon every one hundred dollars' worth so sold by him equal to the tax imposed on other property of same value. The inspector making the assignment of reservation shall be paid by such owner or occupant a fee of one dollar and twenty-five cents per annum rent for every acre assigned to him as riparian owner aforesaid. If any portion of said water front, herein reserved or provided for said riparian owners or occupiers of land shall be occupied by others, with oysters actually planted thereon at the time a location is made of said reservation, the person so occupying the same shall have eighteen months to remove said oysters so planted thereon. The balance of said water front or fronts, in excess of what is herein reserved for the riparian owner, and the residue of the beds of the bays, rivers, and creeks other than natural oyster beds or rocks, may be occupied by any person or persons for the purpose of planting oysters, or the artificial propagation of oysters, thereon for which the sum of twenty-five cents per acre, annually, shall be paid as a tax for every acre so occupied. It shall be the duty of such person desiring to obtain a location for planting or propagating oysters on any portion of water fronts and beds aforesaid, not located or reserved as hereinbefore provided for owners and occupiers of land as aforesaid, to apply to an inspector to have his location ascertained and designated, and the same shall be marked with

suitable stakes, or by other metes and bounds agreed upon between the applicant and inspector; and he shall pay the inspector for his services the fee of one dollar, and thereafter he shall have the exclusive right to the use of such location so designated for the purpose aforesaid so long as he complies with the provisions of the law requiring the payment of twenty-five cents per annum for every acre so occupied, subject, however, to the right of revocation by the general assembly. It is provided, however, that the provision of the foregoing section, imposing a tax of twenty-five cents per acre, shall not apply to creeks and inlets that are not more than one hundred yards wide at their mouth: provided, further, if any portion of said water fronts, or beds of bays, rivers, and creeks, is occupied by others with oysters actually planted thereon at the time a location is made, or sought to be made, under this section, the occupier thereof shall have the prior right against all others but riparian owners who are seeking to have their reservations assigned, to have the said land so occupied by him assigned to him by the inspector: provided, said occupier shall have the land so occupied by him ascertained and designated within thirty days from the time that the inspector is called on to locate said land."

The foregoing section was amended by act of August 27th, 1884, so as to read as follows:

"§ 6. If any owner or occupier of land having a water-front thereon suitable for planting oysters, shall be desirous of obtaining a location thereon for planting oysters, he may make application to any inspector for the county in which he resides, who shall assign to him on such location, as such owner or occupant may designate, in front of his land, a quantity sufficient for the said purpose, to be judged of by said inspector, subject to appeal to the judge of the county court of the county in which said land is located, either in term time or vacation, who is hereby authorized to take cognizance of the same, and make such assignment as shall seem proper:

provided that the said assignment shall not exceed one-half of
an acre: and provided further, that the privilege thus accorded
to the riparian owner may at any time be revoked at the pleas-
ure of the general assembly, said revocation to take effect
eighteen months from date of revocation. It shall be the
duty of such owner or occupant to cause the same to be
marked with suitable stakes, according to the assignment, and
thereafter he shall have the exclusive right to the use thereof
for the purpose aforesaid; and this privilege is accorded to
said owner or occupant in consideration of the extra valuation
ordinarily assessed upon such land, for the water privileges
supposed to attach thereto: provided however, that the inspec-
tor making the assignment of reservation shall be paid by
such owner or occupant a fee of one dollar, and if such owner
or occupant shall sell any oysters from said reservation, also
an annual rent of twenty-five cents; and all other privileges
accorded to riparian owners under the provisions of the sec-
tion hereby amended, are hereby revoked, and the inspectors
shall return to riparian owners all taxes, rents, and fees col-
lected under the provisions of said section. If any portion of
said water-front herein reserved or provided for said riparian
owners or occupiers of land, shall be occupied by others, with
oysters actually planted thereon, at the time a location is made
of said reservation, the person so occupying the same shall
have eighteen months to remove the said oysters so planted
thereon. The balance of said water-front or fronts in excess of
what is herein reserved for the riparian owner, and the residue
of the beds of the bays, rivers, and creeks, other than natural
oyster-beds or rocks, may be occupied by any person or per-
sons, for the purpose of planting oysters, or the propagation of
oysters thereon. It shall be the duty of any such person
desiring to obtain a location for planting or propagating oys-
ters on any portion of the water fronts and beds aforesaid, not
located or reserved as hereinbefore provided for owners and
occupiers of land as aforesaid, to apply to an inspector to have

his location ascertained and designated, and the same shall be marked with suitable stakes, or by other metes and bounds agreed upon between the applicant and inspector, and he shall pay the inspector for his services a fee of one dollar, and also an annual rent of twenty-five cents for each and every acre assigned to him, payable on the first day of October, annually, and thereafter he shall have the exclusive right to the use of such location so designated for the purpose aforesaid, so long as he complies with the provisions of the law requiring the payment of twenty-five cents per annum for every acre so occupied; subject, however, to the right of reservation by the general assembly. If any portion of said water fronts, or beds of bays, rivers, and creeks, is occupied with oysters actually planted thereon, at the time a location is made, or sought to be made under this section, the occupier shall have the prior right against all others to have the land so occupied by him assigned to him by the inspector: provided said occupier shall have the land occupied by him ascertained and designated within thirty days from the time that the inspector is called on to locate said land," etc.

From the decree perpetuating the injunction, the defendants obtained an appeal and *supersedeas.*

*J. B. Donovan,* for the appellants.

The appellants assign the following errors in the final decree:

1st. The circuit court erred in overruling the demurrer to the bill, because the plaintiff had a plain, adequate, and complete remedy in a court of law. If the plaintiff was entitled to the possession of the planting ground, he could have recovered it by a writ of unlawful detainer. *Power & Kellog* v. *Tazewells,* 25 Gratt., 786. *Stuart* v. *Andrews' Ex'or,* Va. Law Jour., 1882, 101. If he was entitled to the oysters, he might have recovered damages for taking them in an action of trespass *de bonis*

*asportatis.* It is not alleged in the bill that the defendants were not responsible for any judgment for damages which might be rendered against them; that the mischief was irreparable; or that any loss which the plaintiff might sustain could not be compensated in damages. *Moore* v. *Steelman*, 5 Hans., 331, and authorities cited, pp. 340–1.

2d. The 6th section of the act of March 4th, 1884, p. 225, expressly provides " that the privilege thus accorded the riparian owner and other persons hereinafter mentioned, who shall have assignments made to them for planting and propagating oysters, may, at any time be revoked at the pleasure of the general assembly, said revocation to take effect eighteen months from the revocation." By the act of August 27th, 1884, "the privilege accorded" the riparian owner of one-fourth of his water front, was so far modified as that the assignment to him should "not exceed one-half of an acre."

The position assumed in the bill that the plaintiff had acquired rights under the act of March 4th, 1884, which could not be defeated by a subsequent repeal of the law, is untenable. Statutes which attempt to tie up the hands of future legislatures have always met with disfavor. The last expression of the legislative will is the law. And although a statute may be made irrepealable in the most express terms, it may be repealed by the next legislature. There is, however, one qualification to this rule. Where a statute partakes of the nature of a contract and rights have accrued under it, those rights cannot be divested by a subsequent repeal of the statute. "A contract," said Marshall, C. J., in *Fletcher* v. *Peck*, 6 Cranch, 133, the leading case on this subject, "is a compact between two or more persons, and is either executory or executed. An executory contract is one in which a party binds himself to do, or not to do, a particular thing. A contract executed is one in which the object of the grant is performed, and this, says Blackstone, differs in nothing from a grant. A grant in its own nature extinguishes the right of the grantor,

and implies a contract not to re-assert that right. A party is therefore always estopped by his own grant." Cooley's Constitutional Limitations, 274.

In the case under consideration there was no grant to extinguish the right of the grantor. There was only, in the words of the statute, a "privilege accorded" to the plaintiff. He was, at most, a tenant at will.

"In parting with sovereign rights the grant must always be based upon a valuable consideration received by the State, so that the State can be supposed to have received *a beneficial equivalent*, for it is conceded on all sides that if the exemption from taxation is made as a *privilege only* it may be revoked at any time." Cooley's Const. Lim., 281.

It can hardly be imagined that for the trivial fee and tax paid, the State intended to part with her control over the public bottoms held by her, *jus publicum*, for the benefit of all her citizens.

An examination of the whole act approved March 4th, 1884, shows it to have been an exercise of the police power of the State. All the revenues derived from it may be applied to the maintenance of a police force—§ 47. It seems that the police power of the State cannot be alienated even by express grant. This opinion is supported by those cases where it has been held that licenses to make use of property in certain modes may be revoked by the State, notwithstanding they may be connected with grants and based upon a consideration. It seems that a State, after granting licenses for selling liquors, for which a license tax is paid, can revoke them by a general law forbidding sales. Cooley's Const. Lim., 283.

A franchise granted by the State, with a reservation of a right of appeal, must be regarded as a mere privilege while it is suffered to continue, but the legislature may take it away at any time, and the grantees must rely, for the perpetuity and integrity of the franchises granted to them, solely upon the faith of the sovereign grantor. A mill dam act, which con-

fers upon the person erecting a dam the right to maintain it, and flow the lands of private owners on paying such compensation as should be assessed for the injury done, may be repealed even as to dams previously erected. Cooley's Const. Lim., 385.

A statute of a State chartering a railroad company, which provides that the company through its constituted authorities may adopt and establish such a tariff of charges for the transportation of persons and property as it may think proper, does not deprive the State of its power to act upon the reasonableness of the tolls and charges adopted. Railroad Commission Cases, 116 U. S., 307. *Stone* v. *Illinois Central R. R. Co.*, 116 U. S., 347; *Stone* v. *New Orleans R. R. Co.*, 116 U. S., 352. These authorities are with confidence relied on to show that it was competent for the legislature, by the act of August 27, 1884, to revoke " the privilege accorded " by the act of March 4th, 1884. *The revocation was only the exercise of a power expressly reserved.*

3. According to the plaintiff's showing, he was not entitled to the possession of the bottom assigned to him until the expiration of eighteen months after the assignment, that is, until November 4th, 1885. According to the provision of section 6 of the act of March 4th, 1884, "the privilege accorded" him was revocable at the pleasure of the general assembly, the revocation to take effect at the expiration of eighteen months from the passage of the act.

4th. With much better grace may the petitioners complain that the act of March 4th, 1884, divested their rights, than the plaintiff may that the act of August 27th, 1884, divested his. When the first-named act was passed, and when the assignment by the inspector to the plaintiff was made, they were in possession under section 1, chapter 214, Acts 1874, p. 238, which declared that all the beds of the rivers and creeks might be used as a common by all the people of the State for the purpose of fishing, fowling, and catching oysters and other shell fish. The 5th section of this act

recognizes property in planted oysters, and provides for taxation not only on planted oysters, but also upon shells deposited upon the bottom for the propagation of oysters. Sections 41 and 42 declare that they shall be subject of larceny. The petitioners had a right of possession to the portions of the public bottoms held by them respectively, recognized by this statute, derived from the common law, confirmed by repeated legislative enactments, (Code of Va., 1860, chap. 62, sections 1, 2; Code of Va., 1849, chap. 62, secs. 1 and 2; 1 Rev. Code, 1819, p. 323, chap. 86, section 6; do., p. 341, chap. 87, section 1; 10 Henning's Statutes at Large, p. 226, chap. 2; Acts 1801-2, p. 10, chap. 7). They had a right of possession, which if withheld from them, they might recover in the courts. (*Power & Kellog* v. *Tazewell,* 25 Gratt., 786; *Stuart* v. *Andrew's Ex'or,* Va. Law Journal, 1882, 101). Though not owners of the soil which was held by the commonwealth in trust, for the protection of the public rights of navigation and fishery, they had a qualified private property in their occupancy recognized by law. Private property cannot be taken for public uses without compensation. It was not in the power of the legislature to turn it over to the plaintiff, even upon his making full compensation to them.

Much of the legislation on the oyster industry has grown out of the idea that the oyster-beds and public bottoms are the absolute property of the commonwealth, held *de jure coronæ.* This is a grave error. Never, until since the late war, did the State assert a right to them, but they were held as a public common, for the benefit of the people. Before the revolution of 1776, the public waters and public bottoms were vested in the crown. The king held the title, but the people had the necessary use; and the right to fish in the sea, and in the arms of the sea, belonged to every subject. They were held by the king as trustee, guardian, or protector of the public rights, who, since *magna charter,* could make no grant in derogation thereof. The distinction was clearly drawn between the public

rights of navigation and fishery, denominated *jura publica* or *jura communia*, and the private rights of the crown, or *jura coronæ*. Any grant of a *jus privatum* was subject to the *jus publicum* of the people, of navigation and fishery. Angell on Tidewaters, chap. 1, pp. 19–28.

After the revolution the commonwealth assumed the protectorate which had been exercised by the crown. The title to the public waters and public bottoms became vested in the commonwealth in the same manner, and for the same purposes, that they had been vested in the crown; and the people, as citizens of the commonwealth, retained all the rights to which they were entitled as British subjects, including the *jus publicum* in the public waters. The right to catch shell fish and floating fish in the public waters and to the use of the public bottoms for that purpose, is, like the right to life, liberty, and property, a sovereign right, which has never been surrendered by the people to the legislature.

In *Arnold* v. *Mundy*, 1 Halstead, 1, the chief justice of New Jersey said: "Upon the revolution, all these rights became vested in the people of New Jersey as sovereign of the country, and are now held as the legislature may regulate them. But the power which may be exercised by the sovereignty of the State is nothing more than what is called *jus regium*—the right of regulating, improving, and securing the same for the benefit of every individual citizen. The sovereign power itself therefore cannot, consistently with the principles of the law of nature and the constitution of a well-organized society, make a direct and absolute grant of the waters of the State, divesting all the citizens of a common right. It would be a grievance which could not be long borne by a free people."

To the same effect are *Doe* v. *Beebe*, 13 Howard, 25 ; *Goodtitle* v. *Kibbe*, 9 Howard, 471. In these cases, and also in *Weber* v. *Harbor Commissioners*, 18 Wallace, 57, 68, we have the distinction clearly drawn between lands held by a State as proprietor, for sale or other disposition, and those held by the

State in trust for the common use of the people, and over which she has only police jurisdiction.

In *Smith* v. *Maryland*, 18 Howard, 71, the court said: "Whatever soil below low-water mark, which is the subject of exclusive property and ownership, belongs to the State on whose maritime border and within whose territory it lies. But this soil is held by the State, not only subject to, but in some sense in trust for, the enjoyment of certain public rights, among which is the common liberty of taking fish, as well shell fish as floating fish. The State holds the property of this soil for the conservation of the public rights of fishing thereon, and may regulate the modes of that enjoyment so as to prevent the destruction of the fishery. In other words, it may forbid all such acts as would render the public right less valuable, or destroy it altogether. This power results from the ownership of the soil, from the legislative jurisdiction over it, and *from its duty to preserve unimpaired those public uses for which the soil is held.*" See also the opinion of Anderson, J., in *McCready* v. *The Commonwealth*, 27 Gratt., 986–8, and Angel on Tide-waters, 46. In *Providence Steam Engine Co.* v. *Providence Steamship Co.*, 12 R. I. Rep., 356, it is said:

"To hold that the State holds the fee of the shores in such a sense that it can sell all the shores, would deprive nearly half the land in this small State of a large portion of its value derived from bounding on the shore." (Gould on Waters, 75.) The policy of this commonwealth, from the revolution until since the late war, has been in strict accordance with the foregoing views. By the Acts of 1780, 1802, 1819 and 1849, the last compiled in the Code of 1860, the public waters and public bottoms continued to be held by the State in trust for the preservation and protection of the public rights of navigation and fishery, and were never converted to the purposes of revenue. The subject came before the legislation at the session 1857–8, and again in 1859, and received exhaustive consideration. Large expenditures by the State rendered heavier

taxation necessary. During the decade the land tax was increased from ten cents to forty cents on the hundred dollars. Governor Wise, by his repeated messages urging taxation upon it, rendered the " oyster *fundum* " as familiar as a household word. Both branches of the legislature were of his political party. But never until the act of 1872–3, now chapter 101 of the Code of 1873, which was promptly repealed by the next legislature, was an attempt made to derive revenue from the use of the public bottoms, which had been held by the people as a public common from time immemorial; and it is believed that this is the first case in which the effort has been seriously made to disposses any one of his common law rights of occupancy by force of any statute.

According to the conclusions of eminent writers, public property or public rights, which cannot be used by all at the same time, must be conceded to the first occupant. A fish in the public waters becomes the property of the one who catches it. Should it escape from him and return to its native element, freed from his control, it will become the property of its next captor. A free seat in a public place belongs to the person who first occupies it. The distinction has long been recognized between floating fish, which have the power of escaping, and oysters, which have no power of locomotion, but remain under the control of the owner, though returned to the water, in a place set apart for the purpose. This right of property in planted oysters has long been recognized and protected in Virginia, both by the civil and criminal law. From it necessarily follows an exclusive right to the use of a portion of the public bottom.

It·has always been conceded to the first occupant, and marking the ground with stakes as evidence of occupancy. The petitioners were lawfully in possession under section 1 of the act of 1874, p. 238. Even if the legislature had the power to confer on the plaintiff the rights claimed by him, the petition-

ers had rights also, as occupants, recognized by section 6 of the act of March 4th, 1884, which should have been respected.

5th. The circuit court erred in perpetuating the injunction and decreeing against the petitioners for costs, instead of dissolving the injunction and dismissing the bill at the plaintiff's costs.

The answer denied all the material averments in the bill. The bill states that the plaintiff had stakes cut and land assigned to him well staked off and plainly marked at heavy expense to him.

This is denied in the answer. John Purcell, in his deposition, denies that the plaintiff staked off the planting-ground in controversy. To the same effect is the testimony of C. C. Simmons, and of the plaintiff himself. The sixth section of the act of 1884 makes it the duty of the riparian owner to cause his assignment "to be marked with suitable stakes." The assignment, according to a minute detail thereof in the bill, was marked by only two stakes. The requirement of the law that the riparian owner should stake in his assignment was evidently intended for the purpose of giving notice to all persons interested. The plaintiff knew of the defendants' rights as occupants, as is manifest by his never exercising any authority over the ground, either by catching oysters there, staking, or planting. The evidence shows that John Purcell had been in possession of a part of the bottom in controversy thirty-six years, and of another part eighteen years; that he had oysters thereon which had remained over from former years; that after the change in the law he had the ground reassigned to him; that he did not know of the assignment to Conrad until two or three weeks after it was made, and after the change in the law and the re-assignment of the ground to Purcell, who, after August 27th, 1884, planted more oysters on it; and that he did not know until the injunction was served upon him that Conrad had any intention of claiming the bottom. C. C. Simmons and the other appellants were also in possession on the 4th of March, 1884.

The Code of 1849, chapter 62, section 2, provides that "subject to the said rights of fishing, fowling, and hunting, the limits or bounds of the several tracts of land lying on the seashore, the said bay" (Chesapeake) "and the rivers and creeks thereof, and the rights and privileges of the owners of such lands, shall extend to ordinary low-water mark, *but no further*, unless where a creek, or river, or some part thereof, is comprised within the limits of a lawful survey." This is in conformity with the previous laws, cited in the margin of the preceding section. "*Nullum tempus occurrit regi*," is a maxim of the law. No lapse of time can bar a right of the commonwealth, or of the public. But the converse of this proposition is not equally true. The claims or rights of an individual against the commonwealth or against the public may be lost by lapse of time, just as though they were against another citizen.

By the perpetuation of the injunction, the appellants have been deprived of possession of the bottom in controversy, which is now in the possession of Mr. Conrad. The legal effect of the proceeding has been that he has recovered it in a court of equity, instead of in a court of law.

The appellants therefore pray restitution; as to which see *Eubank* v. *Ralls' Ex'or*, 4 Leigh, 319, and *Fawkes* v. *Davidson*, 7 Leigh, 560.

*H. R. Pollard*, for the appellee.

Appellee did not seek to recover possession. That, he had already. He sought only to enjoin the appellants from intermeddling with his possession. Appellee was entitled to the oyster grounds opposite his land, prior to the act of March 4, 1884, whereof that act could not deprive him. The rights of riparian owners exist as to navigable as well as to non-navigable streams. Gould., Waters, 277. And an act of the State legislature transferring those rights to another, is void. *Yates*

v. *Milwaukee*, 10 Wall., 497; *Bowman* v. *Wather*, 2 McLean, 376. Riparian rights are property. *Norfolk City* v. *Cocke*, 27 Gratt., 432; *Railway Co.* v. *Faunce*, 31 Gratt., 761. Riparian proprietor has the exclusive right to draw a seine on his own land. *Brink* v. *Richtmyer*, 14 Johns., 255; *Lay* v. *King*, 5 Day, 72. Under act of March 4, 1884, appellee had secured a vested right whereof he could not be deprived.

LEWIS, P., delivered the opinion of the court.

The case, as presented by the pleadings, lies within a narrow compass, and may be briefly disposed of. The decree appealed from is sought to be sustained on two grounds. The first is that the act, approved August 27, 1884, under which the defendants—the appellants here—claim, is unconstitutional and void, because it impairs the vested rights of the complainant under the sixth section of the act, approved March 4, 1884, entitled " an act for the preservation of oysters," etc. Acts 1883–84, p. 225, § 6; Acts (extra session) 1884, p. 37, § 6.

The answer, however, to this objection is, that the right to revoke the privileges accorded under and by virtue of the sixth section of the act last mentioned, is expressly reserved in the act by the legislature, and that the act first above mentioned, so far as it is now complained of, is merely the exercise of the right so reserved. The rights or privileges of the complainant, which by the bill are sought to be protected, were therefore acquired subject to the exercise by the legislature of this reserved right, and consequently the objection above mentioned cannot be sustained. This is an elementary principle, in support of which the citation of authority is unnecessary.

It is, however, contended, in the second place, that the act of March 4, 1884, is unwarranted by the constitution, because it deprived the appellee of his rights of property without due process of law and without just compensation. The ground of this contention, as stated in the briefs of counsel, is, that

the appellee, by virtue of his rights as a riparian owner, has the exclusive right to the oyster grounds opposite his land for the purpose of planting and propagating oysters, and that any act of the legislature which arbitrarily deprives him of this right, in whole or in part, is void. But, manifestly, all this is beside the present case, and cannot be considered on this appeal for two reasons: First, because no such question is raised in the pleadings; and, secondly, because the appellee, having availed himself of the benefit of the statute, and *in his bill claiming under it,* is estopped in this litigation from contesting its validity, whether it be constitutional or not.

In *Daniels* v. *Tearney,* 102 U. S., 415, Mr. Justice Swayne, in delivering the unanimous opinion of the court, said: "It is well settled as a general proposition, subject to certain exceptions not necessary to be here noted, that where a party has availed himself for his benefit of an unconstitutional law, he cannot, in a subsequent litigation with others not in that position, aver its unconstitutionality as a defence, although such unconstitutionality may have been pronounced by a competent judicial tribunal in another suit. In such cases the principle of estoppal applies with full force and conclusive effect;" citing *Ferguson* v. *Landram,* 5 Bush (Ky.), 230; 1 Id., 548; *Van Hook* v. *Whitlock,* 26 Wend., 43; *Lee* v. *Tillotson,* 24 Id., 337; *People* v. *Murray,* 5 Hill (N. Y.), 468; *City of Burlington* v. *Gilbert,* 31 Iowa, 356; *B. C. R. & M. R. R. Co.* v. *Stewart,* 39 Id., 267. See also Cooley Const. Lim., marg. p. 181; *Roanoke City* v. *Berkowitz,* 80 Va., 616, 623.

We do not mean, however, to be understood, as expressing any opinion as to the constitutionality of the act of March 4, 1884, for no such question, as we have said, is presented for determination on this appeal. The decree must, therefore, be reversed, and the bill dismissed.

DECREES REVERSED.