[No. 1395, September 1, 1913.]

PUEBLO OF ISLETA, Plaintiff in Error, v. FRED-
ERICK TONDRE et al., Defendants in Error.

]No. 1408, September 1, 1913.[

PUEBLO OF ISLETA ,Appellant, v. J. A. PICARD et
al., Appellees.

### SYLLABUS (BY THE COURT)

1.   Chapter 49, laws of 1907, does not regulate community
acequias construted prior to the passage of the act as to
the right to change the point of diversion from the stream
into such acequias.

P. 391


2.   Said chapter authorizes the enlarging of an old com-
munity acequia by condemnation proceedings.

P. 395


(1395).   Error to the District Court of Bernalillo
County; Ira A. Abbott, Associate Justice; affirmed.

FRANCIS C. WILSON, Santa Fe, N. M., for plaintiff in
error.

Petitioners failed to allege and prove that they had
complied with the laws of the Territory of New Mexico as
to the appropriation and diversion of public waters, which
is a necessary jurisdictional allegation.   Laws 1907, ch.
49, secs. 3, 12, 45, 25, 44, and 61.

The right of eminent domain is the right to take private
property for public use.   Wheeling, etc., R. R. Co. v. To-
ledo, etc., R. R. Co., 72 Ohio St. 368, 74 N. E. 209, 106
Am. St. 622.

The petition should show a clear right to condemn the
property described.   Lewis on Eminent Domain, vol. 2,
p. 988; Richland School Twp. v. Overmeyer, 164 Ind.
382, 73 N. E. 811; Laws 1907, ch. 49, sec. 3; Laws 1905,
ch. 97; United States v. Hogg, 112 Fed. 909, 111 Fed.

292; New Cache la Poudre Irr. Co. v. Water Supply· & Stor. Co., 68 Pac. 781.

In interpreting the irrigation code the Court may consider, not only the entire statute in order to give effect to all its provisions, but may take into consideration the ends to be accomplished. Dunlap v. United States, 173 U. S. 65, 43 L. Ed. 616.

(No. 1408.)

FRANCIS C. WILSON, Santa Fe, N. M., for appellant.

The right of plaintiff to enjoin the defendants from the use of ditch and headgate of the Los Charcos ditch is not *Res Adjudicata,* because District Court was without jurisdiction. 1 Freeman, Judgments, sec. 120; Brown, Jurisdiction of Courts, sec. 1.

A void judgment is, in legal effect, no judgment. 1 Freeman, Judgments, secs. 117-120; Zalesky v. Iowa State Ins. Co., 70 N. E. 187, 102 Iowa 512; Babbitt v. Field, 52 Pac. 775, 6 Ariz. 6.

Defendants have not complied with the law governing changes in the point of diversion of ditch. Chicago, etc., R. Co. v. Porter, 78 Ia. 426.

Not necessary to allege damages and the complaint would have been sufficient without such an allegation. Walker v. Emerson et al., 26 Pac. 968; Moore v. Water Works, 68 Cal. 146, 8 Pac. 816; Conkling v. Pacific Ind. Co., 25 Pac. 399.

Injunction should be allowed. Parker v. Griswold, 17 Conn. 288; Starford v. Felt, et al., 16 Pac. 900.

Where a statute prescribes the method by which the right to change the point of diversion can be acquired, the statute must be followed. New Cache la Poudre Irrig. Co. v. Water Sup. & Stor. Co., 68 Pac. 781.

FRANK W. CLANCY, Attorney General, Santa Fe, N. M., for defendants in error and appellees.

Plaintiff in error should have obtained a decision set-

ting out findings of fact and conclusions of law, in the District Court. C. L. 1897, sec. 2999; Radcliffe v. Chaves, 15 N. M. 262.

The statute of 1907 has no application to the proceedings of the commissioners of old community acequias. Laws 1907, ch. 49.

The right to condemn does not necessarily depend upon the act of 1907. Laws 1907, ch. 49, sec. 3; C. L. 1897, sec. 23, et seq.

*Reply Brief for Plaintiffs in Error and Appellants.*

Laws 1907, ch. 49, sec. 35; C. L. 1897, sec. 2999; Radcliffe v. Chaves, 15 N. M. 262; Suffolk Gold Min. & Mill. Co. v. Miguel Co. Min. & Mill. Co., 48 Pac. 828; New Cache la Poudre Irr. Co. v. Water Supp. & Stor. Co., 68 Pac. 781; Weil Water Rights, (3d ed.), vol. 2, pp. 544, 547.

### OPINION OF THE COURT.

PARKER, J.—Both of the above cases involve the same questions, and will be considered together, as was done by counsel for the respective parties in their briefs. The first of the above cases involves the validity of a proceeding for the condemnation of a right-of-way for an irrigation ditch through the lands of the plaintiff in error. The condemnation proceedings were instituted by the defendants in error for the purpose of securing a right-of-way and a headgate, taking the water from the Rio Grande River at a point of diversion different from that which had formerly been employed for that purpose. The proceedings resulted in the condemnation of the land and the payment into court of the amount awarded in that proceeding. The second of the above cases was an equity proceeding for an injunction to restrain alleged trespass by reason of the operation of the new ditch constructed over the right-of-way awarded in the condemnation proceedings above referred to. The claims of the plaintiff in error in the first action, and the appellant in the second action, are based in each instance upon a single proposition, which may be

stated as follows: That by reason of the provisions of chap. 49, of the laws of 1907, it became necessary to apply for, and obtain, a permit from the then Territorial, now State Engineer, to change the point of diversion of water from any natural stream in the State into any irrigating ditch, and the defendants in error, and appellees, having obtained no such permit, were not authorized to maintain condemnation proceedings, or change the point of diversion of water from the Rio Grande, and were consequently trespassers in all of their acts.

It appears that both the plaintiff in error and appellant, and the defendants in error and appellees are, and have been, for many years past, appropriators of water for the purpose of irrigation from the Rio Grande River. The head-gate of the ditch of defendants in error had been washed away by a change in the banks of the Rio Grande, and it became necessary for them to seek a new head-gate, together with a considerable length of ditch from the new point of diversion, in order to be able to use the water for the purposes required.

It is contended by counsel for plaintiff in error that the legislature had not only the power to regulate the right to the use of the waters of the State by persons who had acquired water rights long prior to the passage of the act above mentioned, but that it did in said act, in terms, provide for such regulation. It is argued by counsel for appellee that a fair construction of the terms of the act shows that it speaks prospectively from the date of its passage, and was never intended to, and does not apply to, water rights acquired prior to the passage of the act, or to the means of enjoying the same. It becomes necessary, therefore, to examine the act as a whole and to determine the legislative intent therefrom, there being some little obscurity in the same. The title of the act is as follows: "An Act to Conserve and Regulate the Use and Distribution of the Waters of New Mexico; to Create the Office of Territorial Engineer; to Create a Board of Water Commissioners, and for other purposes." Sec. 12 of the act provides that the Territorial

Engineer shall have the supervision of the apportionment
of water in this Territory according to the licenses issued
by him and his predecessors, and the adjudications of the
courts.   This section would seem to limit the jurisdiction
of the Territorial Engineer to such water rights as had
been acquired under licenses issued by him or his prede-
cessors.   Sec. 13, provides for the division of the State
into water districts and Sec. 14, provides that after such
division, after the application of a majority of the water-
users of any district, the State Engineer may appoint a
water master for such district, who shall have charge of
apportionment of waters in his district.   These two sec-
tions would seem in no way to refer to old established
water rights or community acequias, but to speak to the
future and to provide for a condition of affairs to be
brought about by the districting of the State under the
supervision of the Territorial Engineer.   Until the same
had been done it would seem to confer no power and re-
quire no duty of the State Engineer in regard to the use
of any water right.   Sec. 19 provides for a hydrographic
survey of each stream system in the State, and sec. 20
provides for the filing with the Attorney General of the
data so accumulated and, at the request of the State En-
gineer, to require the Attorney General to bring a suit
on behalf of the State for the determination of all
rights to the use of water in such system.   These two sec-
tions also speak to the future, and have no application to
water rights acquired prior to the passage of the act and
the means of enjoying the same.   Sec. 24 of the act re-
quires every applicant intending to acquire the right to
the beneficial use of any of the public waters of the State
to make application to the State Engineer for a permit
to appropriate the same, and the works to be employed
for such purpose are to be subject to the approval of the
State Engineer.   This section requires the applicant or
proposed appropriator of water to furnish the State Engi-
neer with plans and specifications of the proposed works.
Sec. 25 further deals with the detail of the data required
to be furnished to the State Engineer by the proposed ap-

propriator, and provides that the plans of construction may be amended with the approval of the State Engineer, and contains the following proviso:

"Provided further that a change in the proposed point of diversion of water from a stream shall be subject to the approval of the Territorial Engineer under the provisions of sec. 45, hereof, and shall not be allowed to the detriment of the rights of others having valid claims to the use of water from said stream."

Counsel for plaintiffs in error rely much on this proviso and argue that it was intended to apply to all ditches regardless of when the same were constructed, or the right to appropriate the water was acquired. We do not so understand the provisions of sections 24 and 25. They speak entirely of water rights to be acquired by means of filing a petition with the State Engineer, and do not in terms, nor do we think in intent, attempt to deal with any ditches or water rights acquired before the passage of the act. Sec. 45, referred to in the proviso, does not purport to modify the terms of sec. 25 of the act.

The only direct application of the chapter to prior existing rights occurs in sec. 59, which is as follows:

"Nothing contained in this act shall be construed to impair existing, vested rights or the rights and priorities of any person, firm, corporation or association, who may have commenced the construction of reservoirs, canals, pipe lines or other works, or who have filed affidavits, applications or notices thereof for the purpose of appropriating for beneficial use, any waters as defined in section 1 of this act, in accordance with the laws of the Territory of New Mexico, prior to the passage of this act; Provided, however, That all such reservoirs, canals, pipe lines or other works and the rights of the owners thereof shall be subject to regulation, adjudication and forfeiture for abandonment, as provided in this act."

At first glance it might seem that this section expressly subjects all prior rights to regulation in accordance with the terms of the chapter, but a more careful examination of the section leads, we think, to the opposite conclusion.

It is seen that two classes of rights are mentioned in the
section, viz: "existing, vested rights," or "the rights and
priorities of any person, firm, corporation or association,.
who may have commenced the construction of reservoirs,
canals, pipe lines or other works, or who have filed affida-
vits, applications or notices thereof." Then follows the
proviso which applies the feature of regulation to these
"reservoirs, canals, pipe lines, or other works and the rights
of the owners thereof," only, and omits to mention the
first class of rights above pointed out. In determining the
meaning of this section, and the scope of the application
of the regulation feature, resort should be had to the then
existing legislation. We had at the date of the passage of
the act in question, chap. 102, laws of 1905. Sec. 19 of
that act required notice or application to be made to the
Territorial Engineer, which office was first created by that
act, by "all persons, associations, or corporations who shall
desire to construct any dam or dyke for the purpose of
storing, appropriating or diverting any public waters,"
and required them to submit plans and specifications of
the proposed works. The section contains two provisos.
The first is to the effect that if the proposed works are, in
the opinion of the Territorial Engineer, not of sufficient
importance to have the provisions of the section applied
to it, he might suspend the operation of the section, and in
case of works of great importance, where life or property
would be in danger by the failure of such works, the Ter-
ritorial Engineer might require certain precautions there-
in mentioned to be taken by the persons proposing to con-
struct the works. The second proviso excludes from the
operation of the section all works requiring the expendi-
ture of less than Two Thousand Dollars. It thus appears
that the class or kind of works referred to in sec. 59, of
chap. 49, under discussion, must refer to the class of
works, concerning which, under the act of 1905, applica-
tion was not required to be made to the Territorial Engi-
neer, and not to small community ditches or acequias,
which involve no danger to life or property, and which are
of comparatively insignificant cost.

Counsel for appellants argue that sections 3 and 61 of
the act provide the only means whereby an acequia al-
**2** ready constructed can be enlarged by condemnation
proceedings, as was done in these cases, and that there-
fore the defendants in error and the appellees must neces-
sarily have been acting under the said chap. 49 in the pro-
ceedings which were taken; that therefore their rights are
controlled by the terms of that chapter.

We think the conclusion is faulty in the foregoing argu-
ment. Assuming that no other provision of law exists
authorizing the condemnation proceedings taken in these
cases, than sections 3 and 61 of chap. 49, still it does not
follow that the proceeding cannot be maintained. The
question is whether old, prior existing rights of the kind
presented by plaintiff, are subject to regulations by the
State Engineer. If they are not, as we conclude, it does
not follow that the owner of such a right cannot pursue
condemnation proceedings under sections 3 and 61 of the
chapter. The terms of the sections are broad, and include
every person having a water right, and there is nothing
in the terms of either section restricting the class of per-
sons entitled to enjoy the right of condemnation, to those
persons who are seeking either to initiate a right, or whose
rights are regulated by the terms of the act. It therefore
follows that the proceedings in condemnation were regu-
lar and properly maintained.

Further contention is made by counsel for plaintiff in
error and appellant, to the effect that there was a defect
of parties, but this error, if error it was, was cured by the
bringing in of the absent party, who adopted the plead-
ings of the plaintiff in each case and the judgment was in
each case rendered in its favor.

In this connection it may be stated, that the question in-
volved in these cases is no longer of any importance ex-
cept to the immediate parties, insofar as it relates to pub-
lic community acequias, established and in operation prior
to March 19, 1907, for by chap. 26 of the Session Laws of
1912, it is provided that no application to or permit from

the State Engineer is necessary to change the point of diversion of such an acequia.

For the reasons stated, the judgment of the lower Court in each of the cases will be affirmed, and it is so ordered.

We Concur:   David J.. Leahy, District Judge.

I Dissent:   Clarence J. Roberts, C. J.

### DISSENTING OPINION.

ROBERTS, C. J.—The facts are stated in the majority opinion, and need not be here repeated. The sole question presented by these cases, is as to whether or not it was necessary for the appellees and defendants in error to allege and prove that they had applied to the Territorial Engineer for permission to change the point of diversion of their intake ditch, and had secured a permit from such official so to do, prior to the institution of their proceedings in condemnation. If such application and permit were required, by reason of existing statutes, then it is conceded that the lower Court committed an error and a reversal is necessary. A consideration of the question involves two propositions, which may be stated as follows: First, did the legislature have the power to regulate the manner and method of changing the point of diversion of a pre-existing water right, and, second, do the provisions of the act of 1907 apply, in this regard, to an appropriator of water, who had perfected and completed his appropriation prior to the passage of the act?

Discussing the two propositions in the order stated, it is but fair to counsel for appellees and defendants in error to state, that but seeming little reliance is placed upon the first proposition, although the question is stated in his brief. I do not regard the question as an open one, and believe it has been answered in the affirmative, as often as presented. Water, in the natural stream, in all those States where the common law with respect to the use of water and the right thereto is altogether ignored, is held to be the property of the public, or the State as the representative of the public. Wiley v. Decker, 11 Wyo. 496, 73 Pac. 210. Water in the natural stream, thus being the

property of the public, or State, and its economical use, beneficial application and full duty contributing so materially to the prosperity of the people, as a whole, and to the general welfare of the State, the State has the right to provide reasonable regulations for its distribution and application, in order to advance such objects and protect the rights of all persons enjoying or participating in the right. The waters of the State, being thus impressed with a public interest, the State, under its police power, clearly has the right to regulate the distribution and use thereof. Under the power of regulation, which of course must be reasonably exercised, no one would contend that the legislature would be authorized to impose regulations which would be confiscatory. In this case the regulations are not claimed to be confiscatory, or unreasonable ,but the statement is made, unsupported by argument, however, that the legislature could not provide for the regulation of a pre-existing right to the use of water.

A review of a few of the authorities will, I think, clearly and unmistakably demonstrate the right to regulate, old as well as new rights to the use of water.

In the case of C. B. & Q. Ry. Co. v. People ex rel. Drainage Commisisoners, 200 U. S. 561, Mr. Justice Harlan, speaking for the Court, says,

"We hold that the police power of a State embraces regulations designed to promote the public convenience or the general prosperity, as well as regulations designed to promote public health, the public morals or the public safety."

It must be recognized by every one, familiar to any extent with conditions in the arid region, that the general prosperity of a State, situated therein, is dependent upon the economical distribution and use of water, and regulations designed to secure and promote such economical use and distribution, and secure the full duty of water, come clearly within the police power of the State. Again, the legislature of New Mexico, as I view the effect of the sections of the act of 1907, hereinafter set out, determined that it was necessary in order to protect the rights of other water users, that an appropriator, desiring to change the

point of diversion of his water, should, by an orderly pro-
cedure upon notice to all other water users who might be
affected by such change have his right to make such change
determined in advance, thereby preventing injury to
others and long and protracted litigation. The right of
an appropriator of water, to change the point of diversion
thereof, has always been recognized by the courts in the
arid States, but such right is universally denied where
such change will be detrimental to the rights of other ap-
propriators, whether subsequent or prior to the right of
the party desiring the change.

If it be admitted that the legislature has the right to
regulate the use and distribution of water, under its po-
lice power, such right to regulate must be held to extend
to rights in existence at the time of the attempted regula-
tion. As said by Mr. Justice Waite, in the case of Munn
v. Illinois, 94 U. S. 113,

"It matters not in this case that these plaintiffs in error
had built their warehouse and established their business
before the regulations complained of were adopted. What
they did was from the beginning subject to the power of
the body politic to require them to conform to such regu-
lations as might be established by the proper authorities
for the common good."

The power, exercised by the legislature in this case, as I
construe the statute, comes clearly within the police power
of the State, as defined by Judge Cooley, and quoted with
approval by a number of the courts of last resort.

"Police power, in a comprehensive sense embraces the
whole system of internal regulation by which the State
seeks not only to preserve the public order and to prevent
offenses against the State, but to establish for the inter-
course of citizens with citizens those rules of good man-
ners and good neighborhood which are inculcated to pre-
vent a conflict of rights and insure to each the uninter-
rupted enjoyment of his own, so far as is reasonably con-
sistent with the like enjoyment of rights by others. State
ex rel. Star Pub. Co. v. Associated Press, 159 Mo. 410, 60
S. W. 91; Commonwealth v. Bearse, 132 Mass. 542."

Pueblo of Isleta v. Tondre & Pickard, 18 N. M. 388.

A proceeding, for an orderly determination in advance, of the right of an appropriator of water to change the point of diversion thereof, certainly is calculated to "prevent a conflict of rights" between citizens, and to insure to each the "uninterrupted enjoyment of his own, so far as it is reasonably consistent with the like enjoyment of the rights of others," and the interests of the State are involved, and its rights should be protected. Irrigation Co. v. Wayer Supply Co., 29 Colo. 469.

Statutory proceedings, similar to the provisions now under consideration, have been upheld in many of the States, and have likewise been held to apply to rights existing at the date of the passage of the act. See Weil on Water Rights in the Western States, (3rd ed.) sec. 506; New Cache la Poudre Co. v. Water Supply Co., 29 Colo., 469, 68 Pac. 781; Farmers', etc., Co. v. Gothenberg, etc., Co., 73 Neb. 223, 102 N. W. 487. Weil says, (3rd ed., sec. 507) : "Under the recent water codes, the appropriator is usually required by statute to apply to the State Engineer for a permit before changing the point of diversion."

To deny to the State the power to regulate the exercise of a right to use water, where such right was acquired and perfected antecedent to the attempted regulation, would, in my opinion, be inimical to water users and detrimental to the prosperity of the State. If the legislature could not make provisions for the manner of changing the point of diversion, the existence of power in the legislature to make any regulations whatever, applicable to such old rights, must likewise be denied. It could not provide for the maintenance, as to such rights, of suitable headgates, diversion wiers, dams, measuring devices, or other appliances for the economical use and distribution of water. In fact, it could provide no regulations whatever, be they ever so essential for the protection of the rights of others or the public generally. I do not believe further argument is necessary; in fact, it appears to me so concededly within the police power of the State, as to require

no argument whatever, to establish the affirmative of the proposition.

The principal contention of appellees, however, is, that a fair construction of the terms of the act shows that it speaks prospectively from the date of its passage, and was never intended to, and does not apply to water rights acquired prior to the passage of the act, or the means of enjoying the same. The act in question is remedial, and should therefore be liberally construed, so as to make it effectual against the evil which it was intended to abate, if such construction will not deprive any individual of his just rights. See Irrigation Co. v. Water Supply Co., supra, holding such a statute to be remedial, and sec. 686 (2d ed) Lewis' Sutherland Statutory Construction, as to construction of remedial statutes. And the intention of a remedial statute will always prevail over the literal sense of its terms, and, therefore, when the expression is special or particular, but the reason is general, the expression should be deemed general. Lewis' Sutherland Statutory Construction, section 687. And likewise, in construing a statute, consideration must also be given to the result which will follow such a construction, and if it be evident, that such proposed construction will lead to an absurdity, or will render the statute impotent, it is not to be presumed that the legislature intended it to have such meaning. The same author on statutory construction, quoted above, says:

"A result which will follow from one construction or another of a statute is always a potent factor and is sometimes in and of itself conclusive as to the correct solution of the question of its meaning." Sec. 487, and

"Statutes will be construed in the most beneficent way which their language will permit to prevent absurdity, hardship or injustice; to favor public convenience and to oppose all prejudice to public interests." Sec. 490, Lewis' Sutherland Stat. Cons., and again, in the same section, the author says:

"In construing an act of the general assembly, such a construction will be placed upon it as will tend to advance the beneficial purposes manifestly within the contempla-

tion of the general assembly at the time of its passage; and courts will hesitate to place such a construction upon its terms as will lead to manifest absurd consequence, and impute to the general assembly total ignorance of the subject with which it undertook to deal."

In view of these general rules, for the construction of statutes, let us consider the act of 1907, in so far as it is involved in this proceeding, and determine from the act, the intent of the legislature and the meaning properly attributable to the language used. The act in question is comprised of 73 sections, and was intended, I believe, to constitute a complete code of the law of irrigation. By this act the legislature of the Territory attempted to place New Mexico in the forefront of the arid States, in securing proper State control and regulation of irrigation enterprises. It is a matter of history, which I apprehend cannot be controverted, that those States which have provided for a complete system of State control of irrigation have developed and prospered most amazingly. Colorado and Wyoming may be cited among the States early to adopt such a system, and the result has been that millions of dollars have been expended in the construction of irrigation works, which has resulted in unbounded prosperity to the States. New Mexico, prior to 1905, did not attempt to provide for such control, and the result was that no outside capital came into the Territory for investment in such enterprises. True, under the old system there was more or less development done, but almost exclusively by local capital. In 1905 the Territorial legislature enacted chapter 102, "An act creating the office of Territorial Irrigation Engineer, to promote irrigation development and conserve the waters of New Mexico for the irrigation of lands and other purposes," by which it attempted, in a way, to provide for State control, but experience demonstrated that the act was not sufficiently comprehensive and modern to place New Mexico abreast of her sister States, and in 1907, the act was repealed and the present comprehensive, modern and efficient code was enacted. Under the latter act millions of dollars have been expended in irrigation

enterprises in New Mexico, and the resources of the State have amazingly increased. Therefore, I do not believe the Court should, unless the language of the act expressly requires, so interpret it as to undermine its foundation or impair its efficacy.

It appears to me, that the construction contended for by appellees, that "the act speaks prospectively from the date of its passage," if adopted, would place New Mexico in the anomalous situation of having a complete, modern irrigation code, with State supervision and control, applicable to all rights acquired thereunder, but such rights impaired and hampered by the lack of any supervision or control of rights theretofore acquired. Why, I would ask, is there any more reason for State regulation of a water right perfected.in 1907, than there is of a right acquired by appropriation in 1906? In many instances, some of which will be enumerated later, the State has provided for the control and supervision of water rights, and the instrumentalities through which such rights are made available, but to illustrate the absurdity of the suggested construction we need only consider those sections of the act which provide for the change of the point of diversion. Granted that the claimed construction is sound, we then have a class of water users who may change their point of diversion, so far as the statute is concerned, at their own pleasure, regardless of the injury other appropriators may suffer, without let or hindrance. I say, in so far as the statute is concerned, and do not desire to be understood as asserting that they may exercise the right to the injury of others, because such would not be correct, for it has always, so far as I know, been uniformly held by the courts, that an appropriator of water may not change his point of diversion to the injury of other appropriators. Now this being true, A, an appropriator of water under rights perfected in 1906, from a stream system, might move his point of diversion up or down the stream, without regard to the act in question, while B, an appropriator under rights initiated and perfected under the act of 1907, taking his water from a stream directly opposite A's point of

diversion, would be required to follow the statutory procedure. What reason or argument can be advanced in support of the reason for such a distinction by the legislature? I believe none; and the Court should not make the distinction unless compelled to do so by clear and explicit language in the act.

As I read the act, however, its language is plain and the meaning clear. Section 45 reads as follows:

"An appropriator of water may use the same for other than the purpose for which it was appropriated, or may change the place of diversion, storage, or use, in the manner and under the conditions prescribed in sections 25 and 44 of this act."

It will be noted that this language is as plain and explicit as it could well be expressed. It says that an appropriator of water may change the place of diversion in the manner and under the conditions prescribed in the sections referred to. The maxim, *"expressio unius est exclusio alterius,"* applies, and it follows that an appropriator of water has no right to change the point of diversion in any other way or manner.

"Where authority is given to do a particular thing, and the mode of doing it is prescribed, it is limited to be done in that mode; all other modes are excluded." Lewis' Sutherland Stat. Cons., section 492.

The section does not say, "an appropriator under this act," but says, "an appropriator," clearly, I think, referring to any appropriator, however or whenever his right might have been acquired. "Appropriators are diverters of the waters of a stream" (Lux v. Haggin, 69 Cal. 255), and the article "an" is equivalent to "any," (Kauffman v. Superior Court, 115 Cal. 152, 46 Pac. 904), so that the section may fairly be held to mean "any appropriator." This being true, it must be held to apply to any appropriator, whether his rights were perfected precedent or subsequent to the act of 1907, unless the meaning is changed by the sections 25 or 44 of the act. Section 25 makes provision for the correction of an original application for the appropriation of water and the amendment of the plans

of construction, and concludes with the following proviso:

"Provided, further, that a change in the proposed point of diversion of water from a stream shall be subject to the approval of the Territorial Engineer, under the provisions of section 45 hereof, and shall not be allowed to the detriment of the rights of others having valid claims to the use of water from said stream."

Now the mere fact that this proviso is in connection with an original application under the act of 1907, can have no bearing upon the construction of section 45, because the later section only refers to section 25 for the conditions under which the change may be made, viz: Such right shall be subject to the approval of the Territorial Engineer, and shall not be allowed to the detriment of the rights of others having valid claims to the use of water from said stream.

Section 44 is as follows:

"All water used in this Territory for irrigation purposes, except as otherwise provided in this act, shall be considered appurtenant to the land upon which it is used, and the right to use the same upon said land shall never be severed from the land without the consent of the owner of the land; but by and with the consent of the owner of the land, all or any part of said right may be severed from said land, and simultaneously transferred, and become appurtenant to other land, or may be transferred for other purposes, without losing priority of right theretofore established, if such changes can be made without detriment to existing rights, on the approval of an application of the owner to the Territorial Engineer. Before the approval of such application, the applicant must give notice thereof by publication, in the form required by the Territorial Engineer, once a week for four consecutive weeks in a newspaper of general circulation in the stream system in which the tract or tracts of land may be situated."

It will be seen that this section, in so far as applicable, simply prescribed the procedure to be followed.

If the language of the sections quoted was so indefinite and uncertain as to require judicial construction, which it does not, recourse to the title of the act would remove the ambiguity or supply the omission. It is well settled, that where the meaning of the body of the act is doubtful, reference may be had to the title to remove the ambiguity or to supply an omission. 36 Cyc. 1133, and authorities stated. The title of the act in question reads as follows:

"An act to conserve and regulate the use and distribution of the waters of New Mexico, and to create the office of Territorial Engineer, to create a Board of Water Commissioners, and for other purposes."

If the claimed construction be sound, it will be seen that the title of the act does not correctly express the real intention of the law-making body, for, by such title the legislature declared that it was enacting a law "to conserve and regulate the use and distribution of the waters of New Mexico," whereas, in fact, it was only intending to conserve and regulate the unappropriated waters of the Territory. It is too elementary to require the citation of authorities, that water flowing in a natural stream is the property of the public or the State, and does not become the property of the appropriator until he has diverted it into his ditch or canal. While the appropriator, under the law prevailing in this State, has the right to divert and use such water, nevertheless, so long as it is in the natural channel, he has no claim to any specific water. Certainly the legislature recognized that all the waters of the State, flowing in the natural channels, were the property of the State, and declared that it would regulate and conserve such waters. Not a portion of such waters, but all.

Counsel for appellees cites certain sections of the act, which he claims shows that the legislature was speaking prospectively. True it is, many sections may be found which do speak prospectively, for, it would have been impossible for the legislature to provide a complete code, applicable to both old and new rights, without making some provisions for the acquiring, in the first instance,

of a new right to appropriate and use water, or the determination of the rights of old appropriators. Section 12 of the act may be cited as an example. It provides that the Territorial Engineer shall have the supervision of the apportionment of water in this Territory according to the licenses issued by him and his predecessors, and the adjudication of the courts. No one will contend, I apprehend, that this section undertakes to prescribe and limit the powers of the engineer, under the act. It simply defines his power in that particular regard. It necessarily speaks prospectively, for the legislature well knew that under the former laws, in force in the Territory, many water users had old rights to the use of water, with no evidence thereof in any public office. Certainly the Engineer could not supervise the apportionment of water to such rights, without an adjudication by some tribunal, and necessarily a judicial tribunal, of the rights of the old appropriators. The act therefore provided for the determination of such questions, by the courts, and thereafter gave the Engineer supervision of the apportionment of water to all water users of a stream system. But said section 12 did not attempt to curtail any of the other powers or duties conferred upon such official by other sections of the act. The same reasoning applies to sections 13 and 14. While these sections and many others might be cited which do speak prospectively, still a number of other sections might be quoted, which show clearly that it was the intention of the legislature to provide regulations and make provisions for the enjoyment and protection of old rights as well as new. I will refer to a few.

Section 4, after providing for the appointment of a Territorial Engineer, says, "He shall have general supervision of the waters of the Territory, and of the measurement, appropriation and distribution thereof, *and such other duties as are required by this act.*"

Section 32, in part, is as follows:

"If the Territorial Engineer, shall, in the course of his duties, find that *any* works used for storage, diversion or carriage of water are unsafe and a menace to life or prop-

erty, he shall at once notify the owner or agent, specifying the changes necessary and allowing a reasonable time for putting the works in safe condition."

Section 33 makes it a misdemeanor to use works for the storage, diversion or carriage of water contrary to the instructions of the Engineer, after inspection by him and notice that the same are unsafe. And such works may not be used until the Engineer gives notice that the same are safe. Now can it be claimed that these sections only apply to works constructed under the act? Section 32 says "any works," and the evident purpose is to protect life and property. Is there any more reason for protecting life and property from unsafe dams and canals, constructed under the act of 1907 than those constructed under any previous act? If the act was intended only to apply to future appropriators, then an old appropriator might continue to use a dam that was a menace to life and property without authority in any official to compel the owner to make such works safe. Clearly such was not the intention, but the Engineer was given jurisdiction over old as well as new works in this regard.

Section 37 is as follows:

"In any suit concerning water rights, or in any suit or appeal provided for in this act, the Court may in its discretion submit any question of fact arising therein to a jury, or may appoint a referee or referees to take testimony and report upon the rights of the parties."

If the act speaks only of new rights, then the Court would have no power, under the act, to submit a question of fact to a jury, if old rights were involved in the litigation.

Section 42 provides that where a party entitled to use water, fails, for the period of four years, to apply the same to beneficial use, such unused water shall revert to the public. If the act only applies to new rights, then an old appropriator might fail to beneficially use water for any number of years, and still would not forfeit his right thereto.

Section 44 makes all water appurtenant to the land.

where used for irrigation, and provides for the transfer of a water right separate and apart from the land, by following a prescribed procedure. Following out the argument contended for, an old appropriator could not sever his water right from the land and transfer it. And likewise, under section 45, supra, an old appropriator would have no authority to use the water for any other purpose than that for which it was appropriated.

The next section provides that every ditch owner shall, when requested by the Territorial Engineer, construct and maintain a substantial head-gate at the point where the water is diverted, and construct a measuring device. Now there is as much reason to require an old appropriator to maintain a substantial head-gate as a new appropriator. Such requirements were evidently intended to protect the public against damage by reason of a ditch taking too much water and breaking through banks, and also to conserve the waters.

Section 47 makes it a misdemeanor for any person to interfere with, injure or destroy any dam, head-gate, weir, bench mark or other appliance for the diversion, carriage, apportionment or measurement of water. If this section only applies to new rights, then an old appropriator would have no protection, under the statute, in this respect. Section 48 makes the unauthorized use of water, to which another person is entitled, a misdemeanor. Does it mean, a person only entitled to the use of water under the act?

Section 50 reads as follows:

"Whenever any appropriator of water has the right-of-way for the storage, diversion, or carriage of water, it shall be unlawful to place or maintain any obstruction that shall intefrere with the use of the works, or prevent convenient access thereto. Any violations of this section shall be a misdemeanor."

Section 57 provides for the adoption of rules and regulations by water users, and clearly applies to old as well as new works, and likewise, I think, sections 63, 71 and 72 clearly were intended to apply to all water users.

It is contended, however, that by the peculiar wording

of section 59, that it is evident the act in question was only intended to apply to certain water rights and irrigation works. The section is as follows:

"Nothing contained in this act shall be construed to impair existing, vested rights or the rights and priorities of any person, firm, corporation or association, who may have commenced the construction of reservoirs, canals, pipe-lines or other works, or who have filed affidavits, applications or notices thereof for the purpose of appropriating for beneficial use, any waters as defined in section 1 of this act, in accordance with the laws of the Territory of New Mexico, prior to the passage of this act; Provided, however, that all such reservoirs, canals, pipe-lines or other works and the rights of the owners thereof shall be subject to regulation, adjudication and forfeiture for abandonment, as provided in this act.".

As I read the section it does not justify such a construction. It specifically says that the act in question shall not impair existing vested rights. Without this declaration, the act could not have done so, but this was inserted, in my judgment, by the legislature, because of the fact that it had provided for the regulation of such rights, and disclaimed any intention, in so doing, of impairing any existing vested rights. But it is argued that the proviso shows that it was not the intention to regulate such old rights. An examination of the proviso will show that this argument is faulty, because, if it be admitted to be sound, then we have only regulation for such reservoirs, canals, pipe-lines or other works, of those owners "who may have commenced the construction of reservoirs, canals, pipe-lines or other works, or who have filed affidavits, applications or notices thereof for the purpose of apportioning for beneficial use, any waters as defined in section 1 of this act, in accordance with the laws of the Territory of New Mexico, prior to the passage of this act," and have no regulations whatever for rights perfected at that time, or those acquired under the act of 1907. Such, of course, was never the intention of the law-makers, for there is no reason whatever for the regulation of such rights to the

exclusion of all others. The legislature, in my judgment, by the terms of the act in question had provided clearly for the regulation of all rights, but in section 59, it had said that the act should not impair existing vested rights, or the rights of any person who had commenced the construction of their works, etc., and not desiring to remove such unperfected rights from the regulations provided for all other rights, as a matter of precaution inserted the proviso, so as to remove all doubts, and to bring such rights again within the operation of the statute, if perchance they had been taken out by the wording of the first part of the section.

It is also suggested that the works referred to in the section 59 are those, which, under the act of 1905, application must be made to the Territorial Engineer for a permit to construct, and that it does not refer to small community acequias. I would ask what evidence there is in the record in this case to show that the ditch in question, and the works connected with it, cost less than $2000. As I read it, I have not been able to find a word or syllable tending to make any such showing. Nor is there any proof showing the character of the proposed ditch, or the fact that it will involve no danger to life or property. Such claimed construction must be erroneous, for section 59 refers to applications, initiated by affidavit, thus clearly bringing rights initiated under both chapters of the Session Laws of 1905 within the purview of the section.

It is further suggested that the question involved in this case is no longer of practical importance, except to the immediate parties, in so far as it relates to community acequias, established and in operation prior to March 19, 1907, because by chapter 26 of the Session Laws of 1912, it is provided that no application to or permit from the State Engineer is necessary to change the point of diversion of such an acequia. The act of 1912 reads as follows:

"Section 1. That it shall not be necessary for the officers of public community acequias established and in operation prior to March 19, 1907, to make any application to, or obtain any permit from, the Territorial Engi-

neer or the Board of Water Commissioners in order to change the place of diversion; provided, that by such change no increase in the amount of water appropriated shall be made beyond the amount to which the acequia was formerly entitled.

"Section 2. That it is necessary for the preservation of the public peace and safety of the inhabitants of the State of New Mexico, that the provisions of this act shall become effective at the earliest possible time, and therefore an emergency is hereby declared to exist, and this act shall take effect and be in full force and effect from and after its passage."

To the casual observer, it would appear that the act of 1912 was passed, because of the issues involved in this very case, for such act is applicable only to community ditches; and that the authors of the act realized that under the act of 1907 all appropriators of water were placed upon an equal footing in the matter of regulations therein provided for. If the act has any effect or influence on the present case, it must be only to clearly demonstrate that the construction for which I contend is sound, and was so recognized by the legislative branch of the government, else why the necessity for the act. Under well established rules of construction, the act of 1912 amounts to a legislative construction of the former act, and such legislative declaration of the meaning of the former act should govern the construction thereof.

"If it can be gathered from a subsequent statute *in pari materia* what meaning the legislature attached to the words of a former statute, they will amount to a legislative declaration of its meaning, and will govern the construction of the first statute. Morris v. Mellin, 6 Barn. & Cress. 454, 7 Barn. & Cress. 99; The United States v. Freeman, 3 Howard 556."

And Cyc., vol. 36, p. 1142, lays down the rule thus, "A construction of a statute by the legislature, as indicated by the language of subsequent enactments, is entitled to great weight."

In this case, in addition to the plain language of the act

of 1907, we have as a further guide the construction of the act by a subsequent legislature, in full accord with the views herein announced, and it seems to me there is no escape from the conclusion that sections 44, 45 and 25 of the act of 1907 apply to old as well as new rights, and include community acequias, as well as all others, and that these causes should be reversed.

For the reasons stated, I am compelled to dissent.

CLARENCE J. ROBERTS, C. J.

## OPINION OF THE COURT ON MOTION FOR REHEARING.

PARKER, J.—The motion for rehearing is founded upon the proposition that the construction placed upon the irrigation act by this Court makes it class legislation, and renders it obnoxious to section 18 of article II of the Constitution, which has the usual guarantee of "equal protection of the laws." It would seem to require neither argument nor citation of authority for the proposition that, given a reasonable classification of subjects, "equal protection of the laws" is had, if all within any given class are treated alike. That all such classification must be based upon some reasonable distinction, is to be conceded. Counsel for appellants argues, in support of this motion for rehearing, that the classification which results from the construction of the Irrigation Act by the Court, is arbitrary and capricious, and has no reasonable basis upon which to rest. We cannot agree to the contention.

In the first place, regulation of any given business, occupation or right, should be provided for only when there is some reason or necessity for the same. Any given right of the citizen ought to be enjoyable without any supervision or restraint, unless the nature of the right, or of its exercise, is of such a character as to require the same in justice to the rest of the public. Applied to the old public community acequias, as is the case here, there seems to us to be no reason or necessity for any such regulation or restraint as is contended for by plaintiff in error. While perhaps without the field of judicial notice, it is neverthe-

less a matter of common knowledge that these acequias were constructed by the joint efforts of the settlers, whose lands were to be irrigated, without the aid of engineers or without head-gates of anything like a permanent character. There is no storage system in connection with them. They simply are ditches running out into a stream from which the water is taken. The bank of the stream, except at especially favored locations, is constantly subject to erosion in times of high water, and the head-gates, such as they are, must each year be renewed or replaced at points either above or below the original point of diversion as the exigencies of the situation arise. The same situation often arises several times during the irrigation season. It, therefore, becomes a necessity to warn out the people and to reconstruct the head-gates at once, or the crops for that season will perish. The situation of such public community acequias appears, therefore, to be unsuited to the regulation contended for which involves advertisement and delay. for at least four weeks. The legislature is to be presumed, when it passed the act of 1907, to have examined the whole field, and to have determined that there was, by reason of the character of the appropriations and diversions of water for irrigation theretofore made, no reason for regulation or supervision of the means of diverting and carrying of such water. A singular fact in this connection appears. An examination of the records of the State Engineer's office discloses the fact that not a single permit has been granted by him to a public community acequia to appropriate water since the passage of the act of 1907, from which we infer that the legislature correctly determined, when it passed the act, that the whole field suitable to the assertion of such rights as those in this case, had been covered, and that in the future, waters for irrigation were to be stored in large volumes, conducted over large areas, under one system, and, therefore, that supervision and control of such operations was desirable and necessary in behalf of the public welfare, health and safety. There was reason, therefore, for the classification made.

The act in terms applies only to such rights as have been initiated but not perfected, and to the rights which might be initiated and perfected thereunder. It does not apply in terms to perfected rights.

Assuming that under section 24 of the act, public community acequias, as well as all other appropriators, must now apply to the State Engineer for a permit to make an appropriation of water, and must submit to the regulation imposed by the act, if, at some future time, a public community acequia shall have applied to the State Engineer for a permit to appropriate water, and shall have obtained the same, and shall thereupon object to the regulation feature of the act, the question then may arise as to whether the classification, by the act, of prior appropriators into one class, and subsequent appropriators into the other class, is capricious and discriminatory. Until such a contingency, the question is not before us for determination. The denial of equal rights or the imposition of unequal burdens can be pleaded only by those who show that they belonged to the class discriminated against. 8 Cyc. 791; Cooley's Const. Lim. (7th ed.) 232; Kansas City and Union Pac. R.. Co., 59 Kan. 427, 53 Pac. 468, 52 L. R. A. 321; State v. Currens, 111 Wis. 431, 87 N. W. 561, 56 L. R. A. 252; Brown v. Ohio Valley R. Co., 79 Fed. 176.

To this class, if the act is indeed discriminatory, the plaintiffs in error in this case do not belong.

Whether a new appropriator who initiates a right, under the act, could ever question its constitutionality as construed, is not before us for decision, and we do not decide the same, but it would seem to be doubtful if a person who accepts the benefit of a State could, under any circumstances, be heard to complain of its unconstitutionality. See Cooley's Const. Lim. (7th ed.) 554; Fergusson v. Landram, 5 Bush 230, 96 A. D. 359; Moore v. Napier, 42 S. E. 997; Motz v. Detroit, 18 Mich. 495; Dewhurst v. Alleghany, 95 Pa. St. 437; Andrus v. Board of Police, 6 So. 603; Dodd v. Thomas, 69 Mo. 364; Rals-

ton v. Oursler, 12 O. St. 105; State v. Mitchell, 31 O. St. 592, 610.

It is to be said in this connection, that coounsel do not present the alleged unconstitutionality of the act, as construed by us, as directly available to plaintiffs in error, but it is presented more by way of argument against the construction adopted by us.

We fully appreciate the force of the argument, and fully realize the duty of the Court to so construe an act as to make it constitutional, rather than otherwise. But even assuming, but not admitting, that our construction does render the act open to objection of this kind, the terms of the act, as we read them, preclude us from departing from the construction heretofore adopted.

Strength is added to the argument in support of our construction of the act, by reference to some other section not alluded to in the opinion. Section 57 provides that all rules and customs of water users from a "common canal, lateral or irrigation system" shall remain undisturbed by the act, "but, nothing in this section shall be taken to impair the authority of the Territorial Engineer and water master to regulate the distribution of water from the various stream systems of the Territory to the ditches and irrigation systems entitled to water therefrom, under the provisions of this act." Section 58 provides that no water master shall be appointed under this act until the prior rights to the use of water have been determined in one or more stream systems in this Territory, under the provisions of the act. Sec. 12 of the act gives supervisory control over the apportionment of water "according to the licenses issued by him or his predecessors and *the adjudications of the courts.*"

These three sections would seem to provide that when adjudication has been had, under the provisions of the act, of priorities of water rights, and when a water master has been duly appointed for any given water district, then, and not before, does the State Engineer acquire jurisdiction to regulate the distribution of water to the various ditches and irrigation systems, both old and new, in said

water district. After adjudication, old rights would seem to be subjected to the regulation and control by the State Engineer, and the power to regulate the distribution of water to any given irrigation system, would seem to include the power to regulate the point and means of diversion. After adjudication, old rights would seem, by the terms of the act, to come into the same general class with new rights initiated and perfected under the terms of the act, at least so far as the regulation feature is concerned.

The wisdom of postponing the jurisdiction of the State Engineer until after adjudication of the priorities, is at once apparent. Without adjudication, there is no evidence before the State Engineer, except such as he may gather ex-parte in his investigations of the various stream systems, upon which to base his action as to the rights and priorities of water right owners who acquired their rights prior to the passage of the act. As to all rights initiated under the provisions of the act, he has in his office evidence, complete and satisfactory, as to the relative rights of all of the water right owners in that class. And after all, the only reason for supervision of the point of diversion, except when large storage or diversion, or both, might endanger life or property, is to prevent the encroachment of one right upon another. If these rights have not been determined, there is no basis for the exercise of the supervisory power.

The only other section of the act which might be construed to militate against the conclusion reached by the Court, is section 46, which provides that every ditch owner is required, when requested so to do by the State Engineer, to construct and maintain a substantial head-gate at a point where the water is diverted, and a measuring device, of a design approved by the State Engineer, at some practicable point for measuring and apportioning the water, as determined by the State Engineer. At first glance, this section might seem to authorize the State Engineer to require head-gates and measuring devices for the distribution of waters in all cases. But, as we have heretofore seen, the power to apportion and distribute waters as

between old and new water right owner, arises only after adjudication of their respective priorities, and hence has no application to old water rights, at least so far as the distribution of water is concerned, until such adjudication is had. It may be that under this section, the State Engineer has the power to compel the installation of headgates and measuring devices in all ditches in the State, for the purpose of determining the amount of water flowing in such ditches, and thus gather valuable data for future use in his office, or in the courts. But for the purpose of apportionment of water, as before seen, he has no jurisdiction over any old ditch system, until the rights and priorities of the owners of such system have been adjudicated in accordance with the terms of the act.

For the reasons stated, the motion for rehearing will be denied.

Roberts, C. J., dissents.

SYLLABUS (BY THE COURT)

