51 P.(2d) 239

STATE ex rel. RED RIVER VALLEY CO. v. DISTRICT COURT OF FOURTH JUDICIAL DIST. OF NEW MEXICO et al.

No. 4161.

Supreme Court of New Mexico.

Nov. 2, 1935.

C. M. Botts, of Albuquerque, and J. O. Seth, of Santa Fé, for petitioner.

A. T. Hannett and M. C. Mechem, both of Albuquerque, for respondents.

BRICE, Justice.

This cause is before us on motion for rehearing which has been duly considered and is denied. We remain convinced of the correctness of the conclusion reached in our former opinion, but further consideration satisfies us that the question, which counsel on both sides seemed to agree was the decisive one, is not so. This will eliminate some of the reasoning of the former opinion. Hence, it is hereby withdrawn and the one to follow is substituted therefor.

The state of New Mexico on the relation of the Interstate Stream Commission filed a petition in the district court of San Miguel county seeking to condemn certain lands of the Red River Valley Company for public use, to wit: For the purpose of erecting a dam or reservoir for the impounding of waters of the Canadian river. The petitioner is described in the caption of the petition: "The State of New Mexico on the relation of the Interstate Stream Commission."

The preamble of the petition reads: "Comes now the State of New Mexico on the relation of the Interstate Stream Commission and by its Attorney General shows to the court," etc.

After certain proceedings were had in the district court, immaterial to our consideration in this proceeding, the petitioner here, the Red River Valley Company, instituted this proceeding for a writ of prohibition making the district court of San Miguel county and the judge thereof and the Interstate Stream Commission of the State of New Mexico respondents, seeking to restrain the further prosecution of said cause. By stipulation of the parties no alternative writ was issued, but

all proceedings in the district court were stayed until the further order of this court. Respondents demurred to the petition upon the ground, among others, that under the allegations of fact therein, the district court had jurisdiction of the persons and subject-matter of the suit, and therefore prohibition did not lie.

For convenience the respondent district court of the Fourth judicial district will be referred to herein as the "district court." The respondent Fred E. Wilson, judge of said court, as the "district judge," and respondent Interstate Stream Commission as' the "respondent."

It is alleged in the petition that a condemnation proceeding has been instituted by respondent in the district court of San Miguel county against petitioner. A copy of the petition in the district court case is attached to the petition herein, from which it appears that the respondent had determined that the acquisition of the land in question was necessary for a right of way and for the construction, maintenance, and operation of a certain dam or reservoir and other works and appurtenances, to be constructed for the storage and beneficial use of water for irrigation and other public uses. That the respondent and petitioner in the cause below could not agree on proper compensation for lands sought to be condemned, consisting of 33,830 acres, which petitioner herein owned in fee. The petitioner in the district court prayed for the appointment of disinterested freeholders of San Miguel county to assess the damages to result from the taking of such lands for public use. An answer was filed in the district court by the petitioner herein (respondent in said cause). An order was entered appointing commissioners to assess damages as prayed for by petitioner therein. When the cause reached that stage this cause was instituted.

The parties were in apparent agreement in the oral argument, as well as in briefs, that the principal question to be determined here is whether the power of eminent domain has been delegated by the Legislature to the Interstate Stream Commission. This is hardly correct. The question is rather whether the Interstate Stream Commission may institute legal proceedings through which the state's power of eminent domain is invoked for the purposes of such proceedings.

As early as 1876 (chapter 41, N. M. Session Laws 1876), the Legislature declared: "That all currents and sources of water, such as springs, rivers, ditches and currents or manantials of water, flowing from natural sources in the Territory of New Mexico, shall be and they are by this act declared free; in order that all persons traveling in this Territory, shall have the right to take water therefrom for their own use, and that of the animals under their charge." By chapter 41 of the New Mexico Session Laws of 1884 corporations formed for the purpose of supplying water for domestic, irrigation, or manufacturing, and other purposes, were

clothed with the power of eminent domain, being perhaps the first recognition of the public character of the use of water for irrigation purposes in New Mexico. By chapter 12 of the laws of 1887 the powers of corporations supplying water for irrigation and other uses were extended and a Code enacted for their organization, and among the rights granted were: "To enter upon and condemn and appropriate any lands, timber, stone, gravel, or other material that may be necessary for the uses and purposes of said companies." Section 17, subd. 6. In the year 1900 the Supreme Court of the territory, in the case of Albuquerque Land & Irrigation Co. v. Gutierrez, 10 N. M. 177, 61 P. 357, 359, formally adopted what is known as the "Colorado Doctrine," in which it was stated with reference to the appropriation of waters: "Congress has liberally granted this right over the public domain for the purpose of the construction of railroads and for other public uses, and state and territorial legislatures have granted this right for purposes of irrigation, railroads, public roads, and for other purposes. In arid regions the construction of systems of reservoirs, canals, and ditches for the use of the public in irrigating lands is certainly as much for a public purpose as railroads or public roads, and authority to exercise the right of eminent domain is even more of a necessity than for such purposes."

In determining the right of an irrigation corporation organized under the Laws of 1887 to condemn land, this case (the opinion written by Judge McFie in the district court was adopted by the Supreme Court) was important, in that the public policy of the state with reference to irrigation and the use of the waters of the state generally was declared to be a public use. There was considerable legislation along the same line prior to 1907, but in that year the Legislature enacted a comprehensive code of laws in 73 sections for the conservation, development, and beneficial use of the public waters of the state (chapter 49, Laws 1907), in which it was declared:

"Section 1. All natural waters flowing in streams and water courses, whether such be perennial, or torrential, within the limits of the Territory of New Mexico, belong to the public and are subject to appropriation for beneficial use.

"Sec. 2. Beneficial use shall be the basis, the measure and the limit of the right to the use of water."

This was the law controlling the use of public waters in New Mexico at the time of the adoption of the Constitution in which it was continued. In carrying out the public policy of the conservation of the public waters of the state, the Congress of the United States by the Act of June 21, 1898, known as the Ferguson Act (30 Stats. at Large, p. 484), confirmed by the Enabling Act, donated to the territory of New Mexico 500,000 acres of land for the "establishment of permanent water reservoirs" (section 6), the income from which is placed in a spe-

cial fund known as the "Permanent Reservoirs for Irrigation Purposes Income Fund," and this fund has been used since it was established, largely for the purpose of scientific investigation by the state engineer of reservoir sites in the state of New Mexico. Many of such sites have been investigated by means of appropriations from such funds, at a cost of hundreds of thousands of dollars. As an indication of the policy of the state, it may be stated that more than fifty of such appropriations have been made in the last ten years. If the purposes for which these appropriations were made have been carried out, the state engineer's office has data covering the feasibility of the building of many reservoirs for the conservation of the "public waters within the State of New Mexico." We said in Threlkeld v. Third Judicial District Court, 36 N. M. 350, 15 P.(2d) 671, 673, 86 A. L. R. 547: "However, we already had a policy, also time-honored, as to waters. We had nationalized them. Not as a source of public revenue, as minerals are retained for royalties; but as an elemental necessity, like air, which must not be allowed to fall under private control. Only by invoking the power of eminent domain can the state distribute its own waters as its public policy requires. A right of way taken for that purpose is in a large sense devoted to public use. This policy finds general and express recognition in the Constitution. It is impossible to suppose that any interpretation of 'public use' was intended to upset it."

The above history has been recited to show that it has been the public policy of the state and, before it, of the territory of New Mexico, to conserve the public waters of the state and particularly through preparation for the establishment of irrigation reservoirs where practical, for the irrigation of lands.

It has been often said by American courts that the power of eminent domain is inherent in sovereignty and only limited by the constitutions of federal and state governments. Mississippi & Rum River Boom Co. v. Patterson, 98 U. S. 403, 25 L. Ed. 206. The New Mexico limitation on the power is in section 20 of article 2 of the Constitution, which reads: "Private property shall not be taken or damaged for public use without just compensation."

The state may appropriate private property under its inherent power of eminent domain by a legislative act. Mississippi & Rum River Boom Co. v. Patterson, supra. And the question of the necessity and expediency of the taking is a legislative question. Bragg v. Weaver, 251 U. S. 57, 40 S. Ct. 62, 64 L. Ed. 135; Backus v. Ft. St. Union Depot Co., 169 U. S. 557, 18 S. Ct. 445, 42 L. Ed. 853. Whether the use to which the property is to be put is a public use is a judicial question. Shoemaker v. United States, 147 U. S. 282, 13 S. Ct. 361, 37 L. Ed. 170; Kaw Valley Drainage District v. Metropolitan Water Co. (C. C. A. 8th Cir.) 186 F. 315. But the character of use here

involved was long ago determined by the Supreme Court of the territory to be a public use and never departed from by this court. Albuquerque Land & Irrigation Co. v. Gutierrez, 10 N. M. 177, 61 P. 357.

Section 2 of article 16 of the Constitution of New Mexico is as follows: "The unappropriated water of every natural stream, perennial or torrential, within the state of New Mexico, is hereby declared to belong to the public and to be subject to appropriation for beneficial use, in accordance with the laws of the state."

That part of section 3 of chapter 49, Laws of 1907 (the Irrigation Code, now section 151-103, Comp. Stats. 1929 Ann.), pertinent to this case, is as follows: "The United States, the state of New Mexico, or any person, firm, association or corporation, may exercise the right of eminent domain, to take and acquire land right-of-way for the construction, maintenance and operation of reservoirs, canals, ditches, flumes, aqueducts, pipe lines or other works for the storage or conveyance of water for beneficial uses. * * * Such land and right-of-way shall be acquired in the manner provided by law for the condemnation and taking of private property in the state of New Mexico for railroad, telegraph, telephone and other public uses and purposes."

"The right to appropriate private property to public use lies dormant in the state until legislative action is had, pointing out the occasion, the modes, conditions and agencies for its appropriation." Cooley's Constitutional Limitations (8th Ed.) p. 1119.

The naming of the state in section 3 of the Act of 1907, which we have just quoted as one of those by which the power of eminent domain could be exercised, in fact added nothing to its inherent power, but it was placed there for some purpose. A discernible purpose is that when officers and agencies of the state are authorized "to construct, maintain or operate reservoirs, canals, ditches, flumes, aqueducts, pipelines or other works for storage or conveyance of water for beneficial uses," such officers or agencies could initiate legal proceedings in the name of the state invoking an exercise of its power of eminent domain conformably to the provisions of said act.

Whether the Commissioner of Public Lands, who has "the management, care, custody, control and disposition" of public lands of the state (section 132-101, Ann. Stats. 1929), may exercise such right if necessary to protect water rights appurtenant to the lands of the state under the statute now being considered, is not before us, but possibly he has such right. Southern Drainage District et al. v. State, 93 Fla. 672, 112 So. 561.

In 59 C. J. § 480, title States, it is said: "Without express authority therefor, an officer or agent charged with the care, management, or supervision of state property

may institute an action in the name of the state to enforce or protect its interest in the property; and it has been held that a governor, charged by the constitution with the duty and power of causing all laws to be faithfully executed, may institute an action in the name of the state without statutory authorization; but there appears to be some authority to the contrary."

See, also, State ex rel. Olcott v. Duniway, 63 Or. 555, 128 P. 853.

In Pueblo of Isleta v. Tondre, 18 N. M. 388, 137 P. 86, 88, the question was whether or not an acequia created prior to the passing of the law of 1907 was given the power of condemnation under section 3 of the act. The court stated: "The question is whether old, prior existing rights of the kind presented by plaintiff are subject to regulations by the state engineer. If they are not, as we conclude, it does not follow that the owner of such a right cannot pursue condemnation proceedings under sections 3 and 61 of the chapter. The terms of the sections are broad, and include every person having a water right, and there is nothing in the terms of either section restricting the class of persons entitled to enjoy the right of condemnation to those persons who are seeking either to initiate a right or whose rights are regulated by the terms of the act. It therefore follows that the proceedings in condemnation were regular and properly maintainable."

This case indicates the liberal construction of this statute to include every person having a water right. The state of New Mexico is not only performing a governmental or public function in this matter, but is promoting its proprietary interests. It is a large landowner as well as holding title to the public waters of the state, subject only to vested rights in the use of them by those who have applied them to beneficial uses. Twin Falls Canal Co. v. Foote (C. C.) 192 F. 583.

In 1935 the Legislature of the state enacted chapter 25, creating the Interstate Stream Commission (a respondent in this cause), giving it certain designated powers, among which is the power to "investigate water supply, to develop, to conserve, to protect and to do any and all other things necessary to protect, conserve and develop the waters and stream systems of this State, interstate or otherwise; to institute or cause to be instituted in the name of the State of New Mexico any and all negotiations and/or legal proceedings as in its judgment are necessary to carry out the provisions of this Act; to do all other things necessary to carry out the provisions of this Act. * * *" Section 3.

At the same term of the Legislature a companion act, being chapter 24, was passed with reference to such Interstate Stream Commission, sections 2 and 3 of which are as follows:

"Sec. 2. That the Interstate Stream Commission shall annually expend, from the moneys hereinafter appropriated, within the moneys actually available and with-

in the budget submitted to and approved by the Governor of New Mexico, such sum or sums as may be necessary for the establishment of permanent water reservoirs for irrigating purposes in this State and in accordance with the plan submitted by said Commission to the Governor.

"Sec. 3. That there is hereby appropriated annually, all of the moneys in the water reservoirs for irrigation purposes income fund, or as much thereof as may be necessary, for the purpose of complying with this Act and to fulfill and carry out its purposes and intentions. The appropriation herein authorized shall be paid, from time to time as may be necessary, by the State Treasurer on warrants of the State Auditor issued upon vouchers approved by the Interstate Stream Commission."

The act of 1907 (chapter 49) had for its purpose the conservation, protection, and development of the public waters of the state and their application to beneficial uses; the act of 1935 created an agency with authority, as we hold, to institute in the name of the state legal proceedings invoking the state's power of eminent domain for exactly the same purposes. They are in pari materia, and should be construed together as one act.

The authorities on the construction of such statutes are so numerous that we cite only textbooks, as follows:

" * * * all the enactments of the same legislature on the same general sub-ject-matter are to be regarded as parts of one uniform system. Later statutes are considered as supplementary or complementary to the earlier enactments. * * * In the passage of each act, the legislative body must be supposed to have had in mind and in contemplation the existing legislation on the same subject, and to have shaped its new enactment with reference thereto. * * * Whatever is ambiguous or obscure in a given statute will be best explained by a consideration of analogous provisions in other acts relating to the same subject, or by a study of the general policy which pervades the whole system of legislation. * * *

"Neither is it necessary, in order that one statute should be considered as in pari materia with another, so as to lend its aid on a question of interpretation, that the latter act should refer to the former; it is enough if they both relate to the same subject, as the legislature must be presumed to have had the earlier statute in mind, without expressly referring to it." Black on Interpretation of Laws (2d Ed.) § 104, p. 332 et seq.

Also see Lewis' Sutherland Statutory Construction (2d Ed.) vol. II, §§ 442 and 443; 59 C. J. p. 1042 et seq., § 620, Statutes.

If chapters 24 and 25 of the Session Laws of 1935 had been enacted as a part of the 1907 act, no one would question but that the Interstate Stream Commission could institute legal proceedings in the

name of the state invoking the machinery of said act for an exercise of the state's power of eminent domain.

We indicated at the beginning of this opinion that a misapprehension as to the real question up for decision, shared by counsel for both parties and advanced to the court, has resulted in confusion. It is beside the point to consider whether Interstate Stream Commission possesses or has been delegated the power of eminent domain. The case before us does not disclose it exercising, or attempting to exercise, such power. On the contrary, and within proper limits of its express authority, we view it as moving the state itself into an exercise of this sovereign power. The state draws upon no delegated power but rather exercises one of its inherent attributes. If the power is exercised by others than the state itself, constitutional or statutory warrant for such exercise must be shown in the form of a grant or delegation of the power. This is not true as to the state.

Of course, even though conceded the power, the state being an impersonal sovereign, machinery for enforcement of the right must have been provided and some officer or agency must have been duly authorized to set such machinery in motion in behalf of the state. Cf. In re Rugheimer (D. C.) 36 F. 369.

Both conditions, as we have shown, are here fulfilled. Interstate Stream Commis-sion possesses authority to initiate the proceeding in the name of the state and in its right, and the procedure appropriate to an exercise of the power by railroad, telegraph, and telephone companies is assimilated to proceedings instituted by those named in the 1907 act.

In Foltz v. St. Louis & S. F. R. Co. (C. C. A.) 60 F. 316, 317, the late Judge Sanborn, able jurist who adorned the federal bench of the Eighth Circuit for so many years, expressed views similar to ours on the question under consideration. He said: "The power of eminent domain —the right to take the property of the citizen for public use—is an attribute of sovereignty. It lies dormant in the state until the right to exercise it is granted by the state to some public or quasi-public corporation, *or until it is exercised by the state itself.*" (Italics ours.)

The Supreme Court of Washington recorded a like view in Gasaway v. City of Seattle, 52 Wash. 444, 100 P. 991, 992, 21 L. R. A. (N. S.) 68. It said: "The power to condemn land for a public use is in the state of Washington. If it is exercised by others, it must be by reason of some constitutional or statutory provision. *It is not so with the state.*" (Italics ours.)

In 20 C. J. 918, § 335, under title "Eminent Domain," the author says: "Where the government, whether federal or state, is the condemning party, the application may be made by the government itself, or by any officer or agent designated by it."

One of our Territorial Supreme Court decisions, Territory v. Crary, 15 N. M. 213, 103 P. 986, is cited to the text just quoted from Corpus Juris.

All other questions raised by applicants are matters to be considered by the district court, but the point is made by petitioner that the condemnation statutes under which respondent is proceeding conceivably may so operate as to deprive it of its property without due process of law. The point is not jurisdictional. No such deprivation has occurred, nor is its imminence apparent. Furthermore, the reasons here advanced in argument in support of this point, if renewed before the district court, unquestionably will move that court to exercise its broad powers in the premises to safeguard petitioner against any threatened danger of deprivation of its property without due process of law.

Finding the state engaged in a proper exercise of the power of eminent domain in a proceeding initiated in its name and behalf by Interstate Stream Commission thereunto duly authorized, the district court of San Miguel county has jurisdiction of the parties and the subject-matter and should not be restrained from proceeding in said cause. The petition for prohibition should therefore be dismissed, and it is so ordered.

SADLER, C. J., and HUDSPETH, BICKLEY, and ZINN, JJ., concur.